MARSHALL *v.* GORDON, SERGEANT-AT-ARMS OF THE HOUSE OF REPRESENTATIVES OF THE UNITED STATES.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 606. Argued December 11, 12, 1916.—Decided April 23, 1917.

Appellant, while United States Attorney for the Southern District of New York, conducted a grand jury investigation which led to the indictment of a member of the House of Representatives. Acting on charges of misfeasance and nonfeasance made by the member against appellant in part before the indictment and renewed with additions afterward, the House by resolution directed its Judiciary Committee to make inquiry and report concerning appellant's liability to impeachment. Such inquiry being in progress through a sub-committee, appellant addressed to the sub-committee's chairman and gave to the press a letter, charging the sub-committee with

an endeavor to probe into and frustrate the action of the grand jury, and couched in terms calculated to arouse the indignation of the members of that committee and those of the House generally. Thereafter, appellant was arrested in New York by the sergeant-at-arms pursuant to a resolution of the House whereby the letter was characterized as defamatory and insulting and as tending to bring that body into public contempt and ridicule, and whereby appellant in writing and publishing such letter was adjudged to be in contempt of the House in violating its privileges, honor and dignity. He applied for *habeas corpus.*

*Held:* (1) That the proceedings concerning which the alleged contempt was committed were not impeachment proceedings.

(2) That, whether they were impeachment proceedings or not, the House was without power by its own action, as distinct from such action as might be taken under criminal laws, to arrest or punish for such acts as were committed by appellant.

No express power to punish for contempt was granted to the House of Representatives save the power to deal with contempts committed by its own members. Constitution, Art. I, § 5.

The possession by Congress of the commingled legislative and judicial authority to punish for contempts which was exerted by the House of Commons is at variance with the view and tendency existing in this country when the Constitution was adopted, as evidenced by the manner in which the subject was treated in many state constitutions, beginning at or about that time and continuing thereafter.

Such commingling of powers would be destructive of the basic constitutional distinction between legislative, executive and judicial power, and repugnant to limitations which the Constitution fixes expressly; hence there is no warrant whatever for implying such a dual power in aid of other powers expressly granted to Congress.

The House has implied power to deal directly with contempt so far as is necessary to preserve and exercise the legislative authority expressly granted.

Being, however, a power of self-preservation, a means and not an end, the power does not extend to infliction of punishment, as such; it is a power to prevent acts which in and of themselves, inherently, prevent or obstruct the discharge of legislative duty and to compel the doing of those things which are essential to the performance of the legislative functions.

As pointed out in *Anderson* v. *Dunn,* 6 Wheat. 204, this implied power, in its exercise, is limited to imprisonment during the session of the body affected by the contempt.

The authority does not cease when the act complained of has been committed, but includes the right to determine in the use of legitimate and fair discretion how far from the nature and character of the act there is necessity for repression to prevent immediate recurrence, i. e., the continued existence of the interference or obstruction to the exercise of legislative power.

In such case, unless there be manifest an absolute disregard of discretion, and a mere exertion of arbitrary power coming within the reach of constitutional limitations, the exercise of the authority is not subject to judicial interference.

The power is the same in quantity and quality whether exerted on behalf of the impeachment powers or of the others to which it is ancillary.

The legislative power to provide by criminal laws for the prosecution and punishment of wrongful acts—not here involved.

THE case is stated in the opinion.

*Mr. Charles P. Spooner* and *Mr. Jesse C. Adkins,* with whom *Mr. John C. Spooner* was on the brief, for appellant:

No express power is given by the Constitution to the House of Representatives to punish for contempt; the House has no general power to punish any act as a crime. Constitution, Art. I, § 5; *Kilbourn* v. *Thompson,* 103 U. S. 168, 182.

A contempt proceeding is either civil or criminal. *Gompers* v. *Buck Stove & Range Co.,* 221 U. S. 418, 441; *Gompers* v. *United States,* 233 U. S. 604, 610. A civil proceeding is merely process and may be enforced by the House of Representatives when necessary to the performance of its functions. A criminal contempt proceeding is punishment for crime and may be exercised only by the judiciary. Constitution, Art. III, §§ 1, 2; Amendments V, VI. The Continental Congress suffered many indignities, 5 Elliott's Debates, 2d ed., pp. 92–94; 1 Curtis Const. Hist., p. 149; 1 McMaster's History of U. S., pp. 133, 183; but the States were jealous of the powers of the Federal Government, 1 Curtis Const. Hist., pp. 153, 154, 159. Congress was given ample power of self-protection by exclu-

sive jurisdiction over the District of Columbia, and power to pass all necessary laws to carry into execution express powers. Constitution, Art. I, § 8, cl. 17, 18; Federalist, No. 42; 2 Story Const., § 1218; 1 Curtis Const. Hist., p. 487; 1 Tucker Const., § 205.

The power to punish for contempt is not impliedly conferred on Congress, either by analogy to the House of Commons or by necessity. While the House of Commons has such a power, it was derived from the fact that Parliament was originally a court. The House of Representatives was never a court, and does not derive this power by analogy. *Kilbourn* v. *Thompson*, 103 U. S. 168, 183, 184, 188, 189; *Kielley* v. *Carson*, 4 Moore P. C. 63. Such a power is not necessary to enable it to perform its duties or to exercise the powers expressly conferred by the Constitution.

The power claimed is exceedingly broad. It might result in conflict between the judiciary and Congress, as actually happened in England. *Stockdale* v. *Hansard*, 9 Ad. & El. 1; *Sheriff of Middlesex*, 11 Ad. & El. 273. Such a power would practically destroy the freedom of the press and of public discussion, for every critic of either body of Congress or any member thereof might be imprisoned at the whim of Congress, and without trial by the courts. If Congress exercises such power, it will have little time left in which to legislate. On the other hand, Congress must have some power of self-help; the line of demarcation is logical and plain. The principle is that applicable to all grants of powers, *McCulloch* v. *Maryland*, 4 Wheat. 316; *Ex parte Yarbrough*, 110 U. S. 651, 658; and is embodied in the maxim *Quando lex aliquid alicui concedit, concedere videtur et id sine quo res ipsa esse non potest*, 5 Coke, 47. Congress may preserve decorum in its deliberations, compel attendance of its members, admit and expel them, and punish them for disorder. Possibly it may imprison its own members

in the execution of these duties, but compulsory attendance or expulsion would be sufficient punishment. Congress has all power, by removal from its halls and by coercive imprisonment, necessary to self-preservation, but no power to punish for crime. That is for the judiciary.

*Anderson* v. *Dunn*, 6 Wheat. 204, held that the House had implied power to punish for contempt. The Privy Council declined to follow it in *Kielley* v. *Carson, supra.* It was overruled in *Kilbourn* v. *Thompson*, 103 U. S. 168, where it was held that the Constitution conferred no express power on either House to punish for contempts, and no such right was derived by analogy to Parliament. The court declined to decide whether any such power was implied from necessity, but said that little aid for that proposition was found in the late English cases, which are quoted from approvingly. The trend of the opinion is against the existence of such power. The power sustained in *In re Chapman*, 166 U. S. 661, was that of coercion to compel testimony and was merely process. *Ib.* 8 App. Cas. D. C. 315. See also *Interstate Commerce Commission* v. *Brimson*, 154 U. S. 447.

The English cases support the proposition. *Kielley* v. *Carson*, 4 Moore P. C. 63; *Fenton* v. *Hampton*, 11 Moore P. C. 347; *Doyle* v. *Falconer*, L. R., 1 P. C. 328; *Hill* v. *Weldon*, 5 New Brunswick, 1.

Administrative tribunals perform functions closely akin to the judicial, without this power; e. g., The Interstate Commerce Commission, The Patent Office, The General Land Office.

Not all courts have the power to punish for contempt. *Rinehart* v. *Lance*, 43 N. J. L. 311; *In re Mason*, 43 Fed. Rep. 510, 515; *Queen* v. *Lefroy*, L. R., 8 Q. B. 134.

The fact that the House was investigating a charge of impeachment does not alter the case. The legislative power is of greater importance; such a distinction would be difficult of application. The House, when sitting in an

impeachment inquiry is not a court, nor has it power to
punish criminal contempts by analogy to courts.  Im-
peachment in the United States is a political and not a
judicial act; its object is to remove from office, not to
punish for crime; that is left to the courts.  See 26 Harv.
Law Rev., p. 684.

A court renders judgment, usually reviewable, and the
judges may be impeached.  The House charges that a
man is unfit to hold office, and there is no review of its
action.  Judges are appointed as experts in law, and are
sworn to do impartial justice; a court proceeds according
to settled rules of law and upon adequate evidence; the
House proceeds in its ordinary legislative capacity, and
need not take evidence; its members are not selected as
lawyers and take no judicial oath.

The House is not to be likened to a grand jury.  The
true analogy is to the prosecuting attorney; his functions
are identical with those of the House; but neither is
judicial.

Not every court has power to punish for contempt com-
mitted out of its presence.  The King originally was per-
sonally present with the *curia regis*, and any insult to the
court was an offense against the sovereign.  1 Hawk. P. C.
c. 6, § 3; 4 Black. Com., pp. 121–126.  It was prosecuted
only by ordinary criminal procedure.  *Gompers* v. *United
States*, 233 U. S. 604; 3 Trans. Royal Hist. Soc., N. S., p. 147.
The first summary prosecution for a contempt for libelling
a court occurred in 1720, 24 L. Q. R., pp. 184, 266, article
by John Charles Fox.  In Pennsylvania the state courts
as early as 1809 were forbidden to prosecute libel as con-
tempt.  Thomas, Constructive Contempt, p. 26.

The Act of 1831, which became § 725, Rev. Stats., and
is now § 268, Judicial Code, forbids the federal courts to
punish indirect contempts in a summary way.  *Ex parte
Poulston*, 19 Fed. Cas. 1205; *In re Daniels*, 131 Fed. Rep.
95.  *Contra: United States* v. *Toledo Newspaper Co.*, 220

Fed. Rep. 458; *United States* v. *Huff*, 206 Fed. Rep. 715; *In re Independent Pub. Co.*, 228 Fed. Rep. 787.

The most strained doctrine of implied powers will not grant a power to one tribunal by analogy to another when there is grave doubt of the existence of such power in the analogous tribunal.

*Mr. D-Cady Herrick*, with whom *Mr. Henry M. Gold-fogle* and *Mr. Martin W. Littleton* were on the brief, for appellee:

The only question open in *habeas corpus* is that of jurisdiction. *In re Chapman*, 156 U. S. 211, 215; *In re Taylor*, 149 U. S. 164; *Kingsley* v. *Anderson*, 171 U. S. 101–106; *Ex parte Kearney*, 7 Wheat. 29, 42, 43. If the House of Representatives had jurisdiction no court can review its action; and it must be treated as sole judge of the question whether the facts constituted a contempt of its power, dignity and authority. *In re Debs*, 158 U. S. 564, 595–600. Each department of the government is supreme within its own sphere and immune from intrusion by the others. See *Henry* v. *Henkel*, 235 U. S. 219, 227, 228. For the court to review the action of the House would be to draw to itself, in the first instance, the control of all proceedings relative to contempts by either branch of Congress. *Kilbourn* v. *Thompson*, 103 U. S. 168, is distinguishable in that it was an action for damages, brought after the House had acted and punished complainant for contempt, wherein the legality of its action was directly questioned.

Congress has power to punish for contempts committed against it when engaged in any matter within its jurisdiction.

The English cases touching the power of Parliament having been so fully considered in the *Kilbourn Case*, and in the *Nugent Case*, 18 Fed. Cas. 471, we deem it unnecessary to discuss them or consider whether Congress in

either branch can trace the power back to Parliament. We confine ourselves to what Congress has done and what the courts of this country have decided.

The power was exercised in the cases of Randall (1795) and Duane (1800). Hinds' Precedents, pp. 1047–1052; Story Const., § 848. These were followed by a number of others. Hinds' Precedents, vols. 2 and 3, pp. 1047 *et seq.* It was sustained in *Anderson* v. *Dunn*, 6 Wheat. 204; Hinds' Precedents, pp. 1056 *et seq.;* and the *Nugent Case, supra;* Hinds' Precedents, pp. 1110 *et seq.*

The law as settled by *Anderson* v. *Dunn* was followed by courts and text-writers in this country and remained unquestioned until *Kilbourn* v. *Thompson*. See *Ex parte Dalton*, 44 Ohio St. 142; Story Const., § 847, pp. 614–615; Rawle Const., c. 4, p. 48; Hare's Am. Const. Law, vol. 2, pp. 850–851.

*Kilbourn* v. *Thompson* is authority only for the proposition that where the matter under investigation is beyond the jurisdiction of the House there is no authority in either House to compel a witness to testify as to the subject under investigation; and the opinion clearly indicates (p. 193) that if it had been an impeachment proceeding Kilbourn could have been punished for contempt for refusing to answer questions propounded to him as a witness before the committee conducting the investigation. The question whether the power exists as one necessary to enable either House to exercise successfully its function of legislation was not decided.

Either House may punish disorderly behavior of its members, compel attendance of witnesses, and the production of papers in election and impeachment cases and in any case that may involve the existence of those bodies. *Interstate Commerce Commission* v. *Brimson*, 154 U. S. 447, 485. Refusal to answer pertinent questions in a matter of inquiry within the jurisdiction of the Senate constitutes a contempt of that body, and by statute is also

punishable as an offense against the United States. *In re Chapman*, 166 U. S. 661.

If the House through its committee was engaged in a judicial proceeding at the time of the commission of the alleged contempt, then within the reasoning of *Kilbourn* v. *Thompson* it had power and jurisdiction to punish for contempt. The committee was considering charges that appellant had committed impeachable offenses and impeaching him therefor, and was engaged in taking evidence in relation thereto. Impeachments are judicial proceedings. Wilson's Works, vol. 2, p. 45, citing 2 Hale, P. C., p. 150; 4 Black. Com., p. 256; Hare's Am. Const. Law, p. 855; *Kilbourn* v. *Thompson, supra,* pp. 190, 191. The House of Representatives and the Judiciary Committee acting for it and as a part of it is as much a portion of the court of impeachment as a grand jury is a part of the court to which it is attached. A publication in relation to the grand jury is punishable as a contempt. *Percival* v. *State*, 50 Am. St. Rep. (note) 575. In matters over which the House has jurisdiction it may subpœna witnesses and punish for contempt for not appearing, or refusing to testify; and the writing and publication of letters attacking the honesty of the motives and integrity of the House is a matter much more likely to discredit Congress and bring it into contempt than merely disobeying its subpœna.

If the power exists at all, it must exist for all kinds of contempts, and once conceded it is not divisible. The courts will not interfere (the House having jurisdiction in the premises) to say that it can punish for one kind of contempt and not for another.

The House has jurisdiction to punish, as an exercise of power necessary to enable it to fully exercise the powers expressly conferred. Congress has power to "make all laws which shall be necessary and proper for carrying into execution" the powers expressly granted by Article I

of the Constitution—legislative powers; but it is the funda-
mental law that in addition, by implication, in the ab-
sence of any express limitations thereon, it possesses those
necessary to enable it to discharge the duties and obliga-
tions expressly conferred upon it. *United States* v. *Fisher,*
2 Cranch, 358, 396; *McCulloch* v. *Maryland,* 4 Wheat.
316, 413, 421; *Legal Tender Cases,* 12 Wall. 457, 533, 534,
538; *United States* v. *Gettysburg Electric Ry.,* 160 U. S.
668, 681.

In the light of the interpretations given to the word
"necessary" in the clause of the Constitution above
quoted, it can hardly be denied that the power to punish
for contempt is a power necessary to enable Congress to
perform the functions allotted to it by the Constitution.
In exercising legislative functions, or when considering
charges of impeachment, its members should be free
from assaults upon their integrity or the honesty of their
motives; they should be as uninfluenced in their delibera-
tions as should the courts, and to that end they should
have the same means of protecting themselves from dis-
turbing influences. The power to punish for contempt is
inherent in all courts of justice and legislative bodies.
*Yates* v. *Lansing,* 9 Johns. 385, 416; *Anderson* v. *Dunn,*
6 Wheat. 204, 226–228; *In re Chapman, supra,* p. 668.

For Congress, or either branch of it, when acting within
its jurisdiction, to itself summarily punish those guilty of
contempt is to proceed by direction and not by indirection
to a legitimate end by means not prohibited by the Con-
stitution (*McCulloch* v. *Maryland, supra,* p. 421), and by a
method peculiarly appropriate and plainly adapted to its
protection.

MR. CHIEF JUSTICE WHITE delivered the opinion of the
court.

These are the facts: A member of the House of Repre-
sentatives on the floor charged the appellant, who was the

district attorney of the Southern District of New York, with many acts of misfeasance and nonfeasance. When this was done the grand jury in the Southern District of New York was engaged in investigating alleged illegal conduct of the member in relation to the Sherman Anti-Trust Law and asserted illegal activities of an organization known as Labor's National Peace Council to which the member belonged. The investigation as to the latter subject not having been yet reported upon by the grand jury, that body found an indictment against the member for a violation of the Sherman Law. Subsequently calling attention to his previous charges and stating others, the member requested that the judiciary committee be directed to inquire and report concerning the charges against the appellant in so far as they constituted impeachable offenses. After the adoption of this resolution a subcommittee was appointed which proceeded to New York to take testimony. Friction there arose between the subcommittee and the office of the district attorney based upon the assertion that the subcommittee was seeking to unlawfully penetrate the proceedings of the grand jury relating to the indictment and the investigations in question. In a daily newspaper an article appeared charging that the writer was informed that the subcommittee was endeavoring rather to investigate and frustrate the action of the grand jury than to investigate the conduct of the district attorney. When called upon by the subcommittee to disclose the name of his informant the writer declined to do so and proceedings for contempt of the House were threatened. The district attorney thereupon addressed a letter to the chairman of the subcommittee avowing that he was the informant referred to in the article, averring that the charges were true and repeating them in amplified form in language which was certainly unparliamentary and manifestly ill-tempered and which was well calculated to arouse the indignation not only of the members of the

subcommittee but of those of the House generally. This
letter was given to the press so that it might be published
contemporaneously with its receipt by the chairman of
the subcommittee. The judiciary committee reported
the matter to the House and a select committee was ap-
pointed to consider the subject. The district attorney was
called before that committee and re-asserted the charges
made in the letter, averring that they were justified
by the circumstances and stating that they would
under the same conditions be made again. Thereupon
the select committee made a report and stated its con-
clusions and recommendations to the House as fol-
lows:

"We conclude and find that the aforesaid letter written
and published by said H. Snowden Marshall to Hon. C. C.
Carlin, chairman of the subcommittee of the Judiciary
Committee of the House of Representatives, on March 4,
1916 . . . , is as a whole and in several of the separate
sentences defamatory and insulting and tends to bring the
House into public contempt and ridicule, and that the said
H. Snowden Marshall, by writing and publishing the same,
is guilty of contempt of the House of Representatives of
the United States because of the violation of its privileges,
its honor and its dignity."

Upon the adoption of this report under the authority of
the House a formal warrant for arrest was issued and its
execution by the Sergeant-at-Arms in New York was
followed by an application for discharge on *habeas corpus*
and the correctness of the judgment of the court below
refusing the same is the matter before us on this direct
appeal.

Whether the House had power under the Constitution
to deal with the conduct of the district attorney in writing
the letter as a contempt of its authority and to inflict
punishment upon the writer for such contempt as a matter
of legislative power, that is, without subjecting him to the

statutory modes of trial provided for criminal offenses protected by the limitations and safeguards which the Constitution imposes as to such subject, is the question which is before us. There is unity between the parties only in one respect, that is, that the existence of constitutional power is the sole matter to be decided. As to all else there is entire discord, every premise of law or authority relied upon by the one side being challenged in some respects by the other. We consider, therefore, that the shortest way to meet and dispose of the issue is to treat the subject as one of first impression, and we proceed to do so.

Undoubtedly what went before the adoption of the Constitution may be resorted to for the purpose of throwing light on its provisions. Certain is it that authority was possessed by the House of Commons in England to punish for contempt directly, that is, without the intervention of courts, and that such power included a variety of acts and many forms of punishment including the right to fix a prolonged term of imprisonment. Indubitable also is it, however, that this power rested upon an assumed blending of legislative and judicial authority possessed by the Parliament when the Lords and Commons were one and continued to operate after the division of the Parliament into two houses either because the interblended power was thought to continue to reside in the Commons, or by the force of routine the mere reminiscence of the commingled powers led to a continued exercise of the wide authority as to contempt formerly existing long after the foundation of judicial-legislative power upon which it rested had ceased to exist. That this exercise of the right of legislative-judicial power to exert the authority stated prevailed in England at the time of the adoption of the Constitution and for some time after has been so often recognized by the decided cases relied upon and by decisions of this court, some of which are in the

margin,[1] as to make it too certain for anything but statement.

Clear also is it, however, that in the state governments prior to the formation of the Constitution the incompatibility of the intermixture of the legislative and judicial power was recognized and the duty of separating the two was felt, as was manifested by provisions contained in some of the state constitutions enacted prior to the adoption of the Constitution of the United States, as illustrated by the following articles in the constitutions of Maryland and Massachusetts.

"That the House of Delgates may punish, by imprisonment, any person who shall be guilty of a contempt in their view, by any disorderly or riotous behavior, or by threats to, or abuse of their members, or by any obstruction to their proceedings. They may also punish, by imprisonment, any person who shall be guilty of a breach of privilege, by arresting on civil process, or by assaulting any of their members, during their sitting, or on their way to, or return from the House of Delegates, or by any assault of, or obstruction to their officers, in the execution of any order or process, or by assaulting or obstructing any witness, or any other person, attending on, or on their way to or from the House, or by rescuing any person committed by the House: and the Senate may exercise the same power, in similar cases." Constitution of Maryland, 1776, Article XII.

"They [the house of representatives] shall have authority to punish by imprisonment every person, not a member, who shall be guilty of disrespect to the house, by any disorderly or contemptuous behavior in its presence; or who, in the town where the general court is sitting, and during the time of its sitting, shall threaten harm to the

---

[1] *Brass Crosby's Case,* 3 Wils. 188; *Burdett* v. *Abbot,* 14 East, 1; *Stockdale* v. *Hansard,* 9 Ad. & El. 1; *Anderson* v. *Dunn,* 6 Wheaton, 204; *Kilbourn* v. *Thompson,* 103 U. S. 168.

body or estate of any of its members, for anything said or done in the house; or who shall assault any of them therefor; or who shall assault or arrest any witness, or other person, ordered to attend the house, in his way in going or returning; or who shall rescue any person arrested by the order of the house.

"And no member of the house of representatives shall be arrested, or held to bail on mesne process, during his going unto, returning from, or his attending the general assembly.

"The senate shall have the same powers in the like cases; and the governor and council shall have the same authority to punish in like cases: *Provided,* That no imprisonment, on the warrant or order of the governor, council, senate, or house of representatives, for either of the above-described offences, be for a term exceeding thirty days." Constitution of Massachusetts, 1780, part second, chapter 1, § 3, Articles X and XI.

The similarity of the provisions points to the identity of the evil which they were intended to reach. Clearly they operate to destroy the admixture of judicial and legislative power as prevailing in the House of Commons since the provisions in both the state constitutions and the limitations accompanying them are wholly incompatible with judicial authority. Moreover, as under state constitutions all governmental power not denied is possessed, the provisions were clearly not intended to give legislative power as such, for full legislative power to deal with the enumerated acts as criminal offenses and provide for their punishment accordingly already obtained. The object, therefore, of the provisions could only have been to recognize the right of the legislative power to deal with the particular acts without reference to their violation of the criminal law and their susceptibility of being punished under that law because of the necessity of such a legislative authority to prevent or punish the acts independently

because of the destruction of legislative power which would arise from such acts if such authority was not possessed.

How dominant these views were can be measured by the fact that in various other States almost contemporaneously with the adoption of the Constitution similar provisions were written into their constitutions and continued to be adopted until it is true to say that they became if not universal, certainly largely predominant in the States.[1]

No power was expressly conferred by the Constitution of the United States on the subject except that given to the House to deal with contempt committed by its own members. Article I, § 5. As the rule concerning the Constitution of the United States is that powers not delegated were reserved to the people or the States, it follows that no other express authority to deal with contempt can be conceived of. It comes then to this, was such an authority implied from the powers granted? As it is unthinkable that in any case from a power expressly granted there can be implied the authority to destroy the grant made, and as the possession by Congress of the commingled legislative-judicial authority as to contempts which was exerted in the House of Commons would be absolutely destructive of the distinction between legislative, executive and judicial authority which is interwoven in the very fabric of the Constitution and would disregard express limitations therein, it must follow that there is no ground whatever for assuming that any implication as to such a power may be deduced from any grant of authority made to Congress by the Constitution. This conclusion has long since been

---

[1] 1790, South Carolina, Article I, § 13; 1792, New Hampshire, Part second, §§ 22 and 23; 1796, Tennessee, Article I, § 11; 1798, Georgia, Article I, § 13; 1802, Ohio, Article I, § 14; 1816, Indiana, Article III, § 14; 1817, Mississippi, Article III, § 20; 1818, Illinois, Article II, § 13; 1820, Maine, Article IV, Part third, § 6; 1820, Missouri, Article III, § 19.

authoritatively settled and is not open to be disputed. *Anderson* v. *Dunn*, 6 Wheat. 204; *Kilbourn* v. *Thompson*, 103 U. S. 168. Whether the right to deal with contempt in the limited way provided in the state constitutions may be implied in Congress as the result of the legislative power granted, must depend upon how far such limited power is ancillary or incidental to the power granted to Congress,—a subject which we shall hereafter approach.

The rule of constitutional interpretation announced in *McCulloch* v. *Maryland*, 4 Wheat. 316, that that which was reasonably appropriate and relevant to the exercise of a granted power was to be considered as accompanying the grant, has been so universally applied that it suffices merely to state it. And as there is nothing in the inherent nature of the power to deal with contempt which causes it to be an exception to such rule, there can be no reason for refusing to apply it to that subject.

Thus in *Anderson* v. *Dunn*, *supra*, which was an action for false imprisonment against the Sergeant-at-Arms of the House for having executed a warrant for arrest issued by that body in a contempt proceeding, after holding as we have already said, that the power possessed by the House of Commons was incompatible with the Constitution and could not be exerted by the House, it was yet explicitly decided that from the power to legislate given by the Constitution to Congress there was to be implied the right of Congress to preserve itself, that is, to deal by way of contempt with direct obstructions to its legislative duties. In *Kilbourn* v. *Thompson*, *supra*, which was also a case of false imprisonment for arrest under a warrant issued by order of the House in a contempt proceeding, although the want of right of the House of Representatives to exert the judicial-legislative power possessed by the House of Commons was expressly reiterated, the question was reserved as to the right to imply an authority in the House of Representatives to deal with contempt as to a

subject-matter within its jurisdiction, the particular case having been decided on the ground that the subject with which the contempt proceedings were concerned was totally beyond the jurisdiction of the House to investigate. But in *In re Chapman*, 166 U. S. 661, the principle of the existence of an implied legislative authority under certain conditions to deal with contempt was again considered and upheld. The case was this: Chapman had refused to testify in a Senate proceeding and was indicted under § 102 of the Revised Statutes making such refusal criminal. He sued out a *habeas corpus* on the ground that the subject of the refusal was exclusively cognizable by the Senate and that therefore the statute was unconstitutional as a wrongful delegation by the Senate of its authority and because to subject him to prosecution under the statute might submit him to double jeopardy, that is, leave him after punishment under the statute to be dealt with by the Senate as for contempt. After demonstrating the want of merit in the argument as to delegation of authority, the proposition was held to be unsound and the contention as to double jeopardy was also adversely disposed of on the ground of the distinction between the implied right to punish for contempt and the authority to provide by statute for punishment for wrongful acts and to prosecute under the same for a failure to testify, the court saying that "the two being *diverso intuito* and capable of standing together," they were susceptible of being separately exercised.

And light is thrown upon the right to imply legislative power to deal directly by way of contempt without criminal prosecution with acts the prevention of which is necessary to preserve legislative authority, by the decision of the Privy Council in *Kielley* v. *Carson*, 4 Moo. P. C. 63, which was fully stated in *Kilbourn* v. *Thompson*, *supra*, but which we again state. The case was this: Kielley was adjudged by the House of Assembly of Newfoundland

guilty of contempt for having reproached a member "in coarse and threatening language" for words spoken in debate in the House. A warrant was issued and Kielley was arrested. When brought before the House he refused to apologize and indulged in further violent language toward the member and was committed. Having been discharged on *habeas corpus* proceedings, he brought an action for false imprisonment against the Speaker and other members of the House. As a justification the defendants pleaded that they had acted under the authority of the House. A demurrer to the plea was overruled and there was a judgment for the defendants. The appeal was twice heard by the Privy Council, the court on the second argument having been composed of the Lord Chancellor (Lyndhurst), Lords Brougham, Denman, Abinger, Cottenham and Campbell, the Vice Chancellor (Shadwell), the Lord Chief Justice of the Common Pleas (Tindal), Mr. Justice Erskine, Lushington and Baron Parke.

The opinion on reversal was written by Parke, B., who said:

"The main question raised by the pleadings, . . . was whether the House of Assembly had the power to arrest and bring before them, with a view to punishment, a person charged by one of its Members with having used insolent language to him out of the doors of the House, in reference to his conduct as a Member of the Assembly— in other words, whether the House had the power, such as is possessed by both Houses of Parliament in England, to adjudicate upon a complaint of contempt or breach of privilege."

After pointing out that the power was not expressly granted to the local legislature by the Crown, it was said the question was "whether by law, the power of committing for a contempt, not in the presence of the Assembly, is incident to every local Legislature."

"The Statute Law on this subject being silent, the

Common Law is to govern it; and what is the Common Law, depends upon principle and precedent.

"Their Lordships see no reason to think, that in the principle of the Common Law, any other powers are given them, than such as are necessary to the existence of such a body, and the proper exercise of the functions which it is intended to execute. These powers are granted by the very act of its establishment, an act which on both sides, it is admitted, it was competent for the Crown to perform. This is the principle which governs all legal incidents." And after quoting the aphorism of the Roman law to the effect that the conferring of a given power carried with it by implication the right to do those things which were necessary to the carrying out of the power given, the opinion proceeded: "In conformity to this principle we feel no doubt that such an Assembly has the right of protecting itself from all impediments to the due course of its proceeding. To the full extent of every measure which it may be really necessary to adopt, to secure the free exercise of their Legislative functions, they are justified in acting by the principle of the Common Law. But the power of punishing any one for past misconduct as a contempt of its authority, and adjudicating upon the fact of such contempt, and the measure of punishment as a judicial body, irresponsible to the party accused, whatever the real facts may be, is of a very different character, and by no means essentially necessary for the exercise of its functions by a local Legislature, whether representative or not. All these functions may be well performed without this extraordinary power, and with the aid of the ordinary tribunals to investigate and punish contemptuous insults and interruptions."

There can be no doubt that the ruling in the case just stated upheld the existence of the implied power to punish for contempt as distinct from legislative authority and yet flowing from it. It thus becomes apparent that from a

doctrinal point of view the English rule concerning legislative bodies generally came to be in exact accord with that which was recognized in *Anderson* v. *Dunn, supra,* as belonging to Congress, that is, that in virtue of the grant of legislative authority there would be a power implied to deal with contempt in so far as that authority was necessary to preserve and carry out the legislative authority given. While the doctrine of *Kielley* v. *Carson* was thus in substantive principle the same as that announced in *Anderson* v. *Dunn,* we must not be understood as accepting the application which was made of the rule to the particular case there in question since, as we shall hereafter have occasion to show, we think that the application was not consistent with the rule which the case announced and would, if applied, unwarrantedly limit the implied power of Congress to deal with contempt.

What does this implied power embrace? is thus the question. In answering, it must be borne in mind that the power rests simply upon the implication that the right has been given to do that which is essential to the execution of some other and substantive authority expressly conferred. The power is, therefore but a force implied to bring into existence the conditions to which constitutional limitations apply. It is a means to an end and not the end itself. Hence it rests solely upon the right of self-preservation to enable the public powers given to be exerted.

These principles are plainly the result of what was decided in *Anderson* v. *Dunn, supra,* since in that case in answering the question what was the rule by which the extent of the implied power of legislative assemblies to deal with contempt was controlled, it was declared to be *"the least possible power adequate to the end proposed,"* (6 Wheat. 231), which was but a form of stating that as it resulted from implication and not from legislative will, the legislative will was powerless to extend it further

than implication would justify. The concrete application of the definition and the principle upon which it rests were aptly illustrated in *In re Chapman, supra,* where, because of the distinction existing between the two which was drawn, the implied power was decided not to come under the operation of a constitutional limitation applicable to a case resting upon the exercise of substantive legislative power.

Without undertaking to inclusively mention the subjects embraced in the implied power, we think from the very nature of that power it is clear that it does not embrace punishment for contempt as punishment, since it rests only upon the right of self-preservation, that is, the right to prevent acts which in and of themselves inherently obstruct or prevent the discharge of legislative duty or the refusal to do that which there is an inherent legislative power to compel in order that legislative functions may be performed. And the essential nature of the power also makes clear the cogency and application of the two limitations which were expressly pointed out in *Anderson v. Dunn, supra,* that is, that the power even when applied to subjects which justified its exercise is limited to imprisonment and such imprisonment may not be extended beyond the session of the body in which the contempt occurred. Not only the adjudged cases but congressional action in enacting legislation as well as in exerting the implied power conclusively sustain the views just stated. Take for instance the statute referred to in *In re Chapman* where, not at all interfering with the implied congressional power to deal with the refusal to give testimony in a matter where there was a right to exact it, the substantive power had been exerted to make such refusal a crime, the two being distinct the one from the other. So also when the difference between the judicial and legislative powers are considered and the divergent elements which in the nature of things enter into the determination of

what is self-preservation in the two cases, the same result is established by the statutory provisions dealing with the judicial authority to summarily punish for contempt, that is, without resorting to the modes of trial required by constitutional limitations or otherwise for substantive offenses under the criminal law. Act of March 2, 1831, 4 Stat. 487. The legislative history of the exertion of the implied power to deal with contempt by the Senate or House of Representatives when viewed comprehensively from the beginning points to the distinction upon which the power rests and sustains the limitations inhering in it which we have stated. The principal instances are mentioned in the margin [1] and they all except two or three deal with either physical obstruction of the legislative body in the discharge of its duties, or physical assault upon its members for action taken or words spoken in the body, or obstruction of its officers in the performance of their official duties, or the prevention of members from attending so that their duties might be performed, or finally with contumacy in refusing to obey orders to produce documents or give testimony which there was a right to compel. In the two or three instances not embraced in the classes we think it plainly appears that for the moment the distinction was overlooked which existed between the legislative power to make criminal every form of act which can constitute a contempt to be pun-

---

[1] 1795, attempt to bribe members of the House; 1800, publication of criticism of the Senate; 1809, assault on a member of the House; 1818, attempt to bribe a member of the House; 1828, assault on the Secretary to the President in the Capitol; 1832, assault on a member of the House; 1835, assault on a member of the House; 1842, contumacious witness; 1857, contumacious witness; 1858, contumacious witness; 1859, contumacious witness; 1865, assault on a member of the House; 1866, assault on a clerk of a committee of the House; 1870, assault on a member of the House; 1871, contumacious witness; 1874, contumacious witness; 1876, contumacious witness; 1894, contumacious witness; 1913. assault on a member of the House.

ished according to the orderly process of law and the accessory implied power to deal with particular acts as contempts outside of the ordinary process of law because of the effect such particular acts may have in preventing the exercise of legislative authority. And in the debates which ensued when the various cases were under consideration it would seem that the difference between the legislative and the judicial power was also sometimes forgotten, that is to say, the legislative right to exercise discretion was confounded with the want of judicial power to interfere with the legislative discretion when lawfully exerted. But these considerations are accidental and do not change the concrete result manifested by considering the subject from the beginning. Thus we have been able to discover no single instance where in the exertion of the power to compel testimony restraint was ever made to extend beyond the time when the witness should signify his willingness to testify, the penalty or punishment for the refusal remaining controlled by the general criminal law. So again we have been able to discover no instance, except the two or three above referred to, where acts of physical interference were treated as within the implied power unless they possessed the obstructive or preventive characteristics which we have stated, or any case where any restraint was imposed after it became manifest that there was no room for a legislative judgment as to the virtual continuance of the wrongful interference which was the subject of consideration. And this latter statement causes us to say, referring to *Kielley* v. *Carson, supra,* that where a particular act because of its interference with the right of self-preservation comes within the jurisdiction of the House to deal with directly under its implied power to preserve its functions and therefore without resort to judicial proceedings under the general criminal law, we are of opinion that authority does not cease to exist because the act complained of had been committed

when the authority was exerted, for to so hold would be to admit the authority and at the same time to deny it. On the contrary when an act is of such a character as to subject it to be dealt with as a contempt under the implied authority, we are of opinion that jurisdiction is acquired by Congress to act on the subject and therefore there necessarily results from this power the right to determine in the use of legitimate and fair discretion how far from the nature and character of the act there is necessity for repression to prevent immediate recurrence, that is to say, the continued existence of the interference or obstruction to the exercise of the legislative power. And of course in such case as in every other, unless there be manifest an absolute disregard of discretion and a mere exertion of arbitrary power coming within the reach of constitutional limitations, the exercise of the authority is not subject to judicial interference.

It remains only to consider whether the acts which were dealt with in the case in hand were of such a character as to bring them within the implied power to deal with contempt, that is, the accessory power possessed to prevent the right to exert the powers given from being obstructed and virtually destroyed. That they were not, would seem to be demonstrated by the fact that the contentions relied upon in the elaborate arguments at bar to sustain the authority were principally rested not upon such assumption, but upon the application and controlling force of the rule governing in the House of Commons. But aside from this, coming to test the question by a consideration of the conclusion upon which the contempt proceedings were based as expressed in the report of the select committee which we have previously quoted and the action of the House of Representatives based on it, there is room only for the conclusion that the contempt was deemed to result from the writing of the letter not because of any obstruction to the performance of legis-

lative duty resulting from the letter or because the preservation of the power of the House to carry out its legislative authority was endangered by its writing, but because of the effect and operation which the irritating and illtempered statements made in the letter would produce upon the public mind or because of the sense of indignation which it may be assumed was produced by the letter upon the members of the committee and of the House generally. But to state this situation is to demonstrate that the contempt relied upon was not intrinsic to the right of the House to preserve the means of discharging its legislative duties, but was extrinsic to the discharge of such duties and related only to the presumed operation which the letter might have upon the public mind and the indignation naturally felt by members of the committee on the subject. But these considerations plainly serve to mark the broad boundary line which separates the limited implied power to deal with classes of acts as contempts for self-preservation and the comprehensive legislative power to provide by law for punishment for wrongful acts.

The conclusions which we have stated bring about a concordant operation of all the powers of the legislative and judicial departments of the Government, express or implied, as contemplated by the Constitution. And as this is considered, the reverent thought may not be repressed that the result is due to the wise foresight of the fathers manifested in state constitutions even before the adoption of the Constitution of the United States by which they substituted for the intermingling of the legislative and judicial power to deal with contempt as it existed in the House of Commons a system permitting the dealing with that subject in such a way as to prevent the obstruction of the legislative powers granted and secure their free exertion and yet at the same time not substantially interfere with the great guarantees and limitations con-

cerning the exertion of the power to criminally punish,—
a beneficent result which additionally arises from the
golden silence by which the framers of the Constitution
left the subject to be controlled by the implication of
authority resulting from the powers granted.

It is suggested in argument that whatever be the general rule, it is here not applicable because the House was
considering and its committee contemplating impeachment proceedings. The argument is irrelevant because
we are of opinion that the premise upon which it rests is
unfounded. But indulging in the assumption to the contrary we think it is wholly without merit as we see no
reason for holding that if the situation suggested be
assumed it authorized a disregard of the plain purposes
and objects of the Constitution as we have stated them.
Besides it must be apparent that the suggestion could not
be accepted without the conclusion that under the hypothesis stated the implied power to deal with contempt as
ancillary to the legislative power had been transformed
into judicial authority and become subject to all the
restrictions and limitations imposed by the Constitution
upon that authority,—a conclusion which would frustrate
and destroy the very purpose which the proposition is
advanced to accomplish and would create a worse evil
than that which the wisdom of the fathers corrected before the Constitution of the United States was adopted.
How can this be escaped, since it is manifest that if the
argument were to be sustained those things which, as
pointed out in *In re Chapman,* *supra,* were distinct and
did not therefore the one frustrate the other—the implied
legislative authority to compel the giving of testimony
and the right criminally to punish for failure to do so—
would become one and the same and the exercise of one
would therefore be the exertion of, and the exhausting
of the right to resort to, the other. Again, accepting
the proposition, by what process of reasoning could the

conclusion be escaped that the right to exert implied authority by way of contempt proceedings in so far as essential to preserve legislative power would become itself an exertion of legislative power and thus at once be subject to the limitations as to modes of trial exacted by the guarantee of the Constitution on that subject. We repeat, out of abundance of precaution, we are called upon to consider not the legislative power of Congress to provide for punishment and prosecution under the criminal laws in the amplest degree for any and every wrongful act, since we are alone called upon to determine the limits and extent of an ancillary and implied authority essential to preserve the fullest legislative power, which would necessarily perish by operation of the Constitution if not confined to the particular ancillary atmosphere from which alone the power arises and upon which its existence depends.

It follows from what we have said that the court below erred in refusing to grant the writ of *habeas corpus* and its action must be and it is, therefore reversed, and the case remanded with directions to discharge the relator from custody.

*And it is so ordered.*