# Legal Effectiveness of Congressional Subpoenas Issued After an Adjournment *Sine Die* of Congress

A congressional subpoena issued after an adjournment *sine die* of Congress lacks any legal force and effect and does not impose any legal obligation to comply with the subpoena.

November 12, 1996

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

You have asked this Office to analyze the legal effectiveness of a congressional subpoena issued after a *sine die* adjournment of Congress. In a 1982 opinion, this Office concluded that a congressional subpoena issued during a session of Congress lacks present force and effect after the adjournment *sine die* of Congress. *See Continuing Effect of a Congressional Subpoena Following the Adjournment of Congress*, 6 Op. O.L.C. 744 (1982). According to that opinion, the lapse in legal effectiveness "results from the same factors that produce, at the same time, the death of all pending legislation not enacted . . . and the termination of congressional authority to hold a contumacious witness in custody." *Id.* at 745 (internal citations omitted). It would necessarily follow from the analysis contained in that opinion that a subpoena issued after an adjournment *sine die* lacks any force and effect ab initio. After revisiting the issue, we continue to adhere the analytical framework used in this Office's 1982 opinion. Therefore, for the reasons set forth below, we conclude that a congressional subpoena issued after a *sine die* adjournment has no legal effect.[1]

## I. LEGAL DISCUSSION

The Constitution vests all legislative authority in Congress. U.S. Const. art. I, § 1. Although the Constitution does not expressly authorize Congress to issue subpoenas, the Supreme Court has stated that the authority to subpoena is an "indispensable ingredient" of Congress' legislative power. *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 505 (1975). In *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927), the Court declared that "the power of inquiry — with process to enforce it — is an essential and appropriate auxiliary to the legislative function." According to the Court:

> A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation

---

[1] Several rules of the House and Senate apply to the authorization and issuance of congressional subpoenas. *See, e.g.,* House Rule XI(2)(m)(1)(B); Senate Rule XXVI(1). *See also* House Rule XI(2)(m)(2)(A); Senate Rule XXVI(7)(a)(1). For purposes of analysis, this memorandum assumes that a post-*sine die* adjournment congressional subpoena can be issued in a manner consistent with the relevant House and Senate rules.

> is intended to affect or change; and where the legislative body does not itself possess the requisite information — which not infrequently is true — recourse must be had to others who do possess it. Experience has taught that mere requests for such information often are unavailing, and also that information which is volunteered is not always accurate or complete; so some means of compulsion are essential to obtain what is needed.

*Id.* at 175. Similarly, in *Eastland*, the Court said:

> The power to investigate and to do so through compulsory process plainly falls within [the definition of Congress's legislative function]. This Court has often noted that the power to investigate is inherent in the power to make laws.

*Eastland*, 421 U.S. at 504.[2]

This understanding — that Congress's subpoena power inheres in and is ancillary to its power to legislate — leads logically to the conclusion that the legal obligation to comply with a congressional subpoena lapses upon the cessation of Congress's authority to legislate. Just as an adjournment *sine die* results in the death of all pending legislation, *see* Floyd M. Riddick, *The United States Congress: Organization and Procedure* 56 (1949), making passage and presentment to the President impossible, *see* U.S. Const. art. I, §§ 1, 7; *The Pocket Veto Case*, 279 U.S. 655, 681 (1929) (final adjournment of Congress "terminates the legislative existence of the Congress"), so too must it result in the cessation of the auxiliary power to compel witnesses to present testimony or information via subpoena. It follows that congressional subpoenas issued after an adjournment *sine die* but prior to the beginning of a new Congress have no legal effect.

The limitations the Court has placed upon Congress's use of its inherent authority to deal with contempts provide additional support for the view that congressional subpoenas issued after an adjournment *sine die* have no legal effect. The Court has held that Congress has implicit authority under the Constitution to deal with a contempt of its authority. *See Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 226–30 (1821). This power stems, according to the Court, from Congress's inherent authority to preserve its constitutionally-derived legislative power. *See id.*; *Marshall v. Gordon*, 243 U.S. 521, 541 (1917) ("[I]n virtue of the grant of legislative authority there [is] a power implied to deal with contempt in so far as that authority [is] necessary to preserve and carry out the legislative authority given.").

---

[2] The Court emphasized in *Eastland* that "whether particular activities . . . fall within the 'legitimate legislative sphere' [depends upon] whether the activities took place 'in a session of the [house of Congress at issue] by one of its members in relation to the business before it.'" *Id.* at 503–04 (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1881)).

The Court has made clear, however, that there are limits to Congress's use of this power. First, such power "rests only upon the right of self-preservation; that is, the right to prevent acts which, in and of themselves, inherently obstruct or prevent the discharge of legislative duty or the refusal to do that which there is an inherent legislative power to compel in order that legislative functions may be performed." *Id.* at 542.[3] Second, even where Congress properly exercises its authority to deal with a contempt, the punishment must cease upon the adjournment of Congress:

> [T]he existence of the power that imprisons is indispensable to its continuance; and although the legislative power continues perpetual, *the legislative body ceases to exist on the moment of its adjournment or periodic dissolution. It follows, that imprisonment must terminate with that adjournment.*

*Anderson*, 19 U.S. at 231 (emphasis added); *accord Marshall*, 243 U.S. at 542 (Congress's contempt power, "even when applied to subjects which justified its exercise, is limited to imprisonment, and such imprisonment may not be extended beyond the session of the body in which the contempt occurred."). These limitations, which the Court concluded were justified in view of the nature of the authority upon which Congress's contempt power is based (i.e., self-preservation of legislative authority), *see Anderson*, 19 U.S. at 230–31,[4] provide additional support for the conclusion that Congress lacks the power of compulsory process after a *sine die* adjournment.

Because this conclusion rests upon the cessation of Congress's legislative existence, it applies equally to House and Senate subpoenas. However, the case of the Senate merits some separate discussion, because the Court, noting certain internal and structural differences between the House and the Senate, has occasionally referred to the Senate as a "continuing body." *See Eastland*, 421 U.S. at 512; *McGrain*, 273 U.S. at 181; *cf. Gojack v. United States*, 384 U.S. 702, 706 n.4

---

[3] Applying this standard, the Court in *Marshall* invalidated an attempt by the House to respond to a contempt in the form of "irritating and ill-tempered statements made in [a] letter [addressed to the chairman of a House subcommittee]," *id.* at 546, where "the contempt relied upon was not intrinsic to the right of the House to preserve the means of discharging its legislative duties," *id.*, but was, instead, "related only to the presumed operation which the letter might have upon the public mind and the indignation naturally felt by members of the committee on the subject." *Id.*

[4] The Court in *Anderson* stated:

> The present question is, what is the extent of the punishing power which the deliberative assemblies of the Union may assume and exercise on the principle of self-preservation?
>
> Analogy, and the nature of the case, furnish the answer—"the least possible power adequate to the end proposed;" which is the power of imprisonment. . . . And even to the duration of imprisonment a period is imposed by the nature of things, since the existence of the power that imprisons is indispensable to its continuance; and although the legislative power continues perpetual, the legislative body ceases to exist on the moment of its adjournment or periodic dissolution. It follows, that imprisonment must terminate with that adjournment.

*Id.*

(1966). In *McGrain*, the Court suggested that the Senate's status as a continuing body might prevent a controversy over an attempt by the Senate to compel compliance with one of its subpoenas from becoming moot upon the adjournment of the Congress during which the Senate action was initially taken. *See McGrain*, 273 U.S. at 181; *see also Eastland*, 421 U.S. at 512. The continuing existence of a case and controversy with respect to enforcement of a subpoena might seem to imply that the subpoena had a continuing legal effect beyond a *sine die* adjournment.

The Court's discussion of mootness in *McGrain* does not alter our conclusion regarding the legal effect of a Senate subpoena issued after an adjournment *sine die*, for two reasons. First, in addressing the mootness issue, the Court in *McGrain* relied upon an interpretation of a passage in *Jefferson's Manual* that appears to have misunderstood that passage's actual import. The Court quoted the following passage from *Jefferson's Manual*:

> Neither House can continue any portion of itself in any parliamentary function beyond the end of the session without the consent of the other two branches. When done, it is by a bill constituting them commissioners for the particular purpose.

*McGrain*, 273 U.S. at 181 (quoting Senate Rules and Manual, 1925, p. 303). Referring to that language, the Court concluded that "the context shows that the reference is to the two houses of Parliament when adjourned by prorogation or dissolution by the king." *Id.*

The larger passage of which this quotation is a part, and which we have set out in a footnote,[5] indicates that Jefferson is drawing upon the practices of Par-

---

[5] The larger passage from *Jefferson's Manual* is as follows:

Parliament have three modes of separation, to wit: by adjournment, by prorogation or dissolution by the King, or by the efflux of the term for which they were elected. Prorogation or dissolution constitutes there what is called a session; provided some act was passed. In this case all matters depending before them are discontinued, and at their next meeting are to be taken up de novo, if taken up at all. Adjournment, which is by themselves, is no more than a continuance of the session from one day to another, of for a fortnight, a month, &c., ad libitum. All matters depending remain in statu quo, and when they meet again, be the term ever so distant, are resumed, without any fresh commencement, at the point at which they were left. Their whole session is considered in law but as one day, and has relation to the first day thereof.

Committees may be appointed to sit during a recess by adjournment, but not by prorogation. Neither House can continue any portion of itself in any parliamentary function beyond the end of the session without the consent of the other two branches. When done, it is by a bill constituting them commissioners for the particular purpose.

Congress separate in two ways only, to wit, by adjournment, or dissolution by the efflux of their time. What, then, constitutes a session with them? A dissolution certainly closes one session, and the meeting of the new Congress begins another. The Constitution authorizes the President, "on extraordinary occasions to convene both Houses, or either of them." If convened by the President's proclamation, this must begin a new session, and of course determine the preceding one to have been a session. So if it meets under the clause of the Constitution which says, "the Congress shall assemble at least once in every year, and such meeting shall be on the first Monday in December, unless they shall appoint a different day." This must begin a new session, for even if the last adjournment was to this day the act of adjournment is

Continued

liament to propound analogous principles to guide the newly established Congress. Where differences in the English and American systems of governance necessitate explication of the analogies, Jefferson does so. Where the analogy between the English and American systems applies without modification, however, there is no need for further discussion. Thus, in the quotation repeated in *McGrain*, Jefferson notes that upon the end of the session, all pending matters are discontinued and all parliamentary functions cease, unless special provisions, requiring the consent of the other two branches, have been made. The larger passage reveals that this assertion has been preceded by a discussion of the three modes by which Parliament "separates," only two of which amount to the end of a legislative session. So Jefferson has stated the ways in which Parliament can be separated so as to result in the termination of all parliamentary functions. He then continues on in the passage to note that Congress is unlike the Parliament, in the specific respect that it has only two modes of separation. This prompts Jefferson to ask, "[w]hat, then, constitutes a session [of Congress]?" *Jefferson's Manual* at 292. An answer to that question is necessary in order to apply the principle that all pending matters are discontinued and all parliamentary functions cease upon termination of the legislative session, but a repetition of the principle itself is unnecessary, because Jefferson is taking it as understood that this fundamental principle applies to the American legislature just as it applies to the British legislature.[6]

Reading this passage to suggest that Jefferson meant *not* to apply the principle to Congress would be most peculiar. Such a reading would need to explain why Jefferson had so carefully noted the differences with respect to what constitutes a session of Congress, as compared to Parliament, and yet kept so completely hidden his belief that entirely different consequences flowed from the end of a congressional session as compared to the end of a parliamentary session.

Nor can this passage be read to treat the Senate differently from the House. Throughout the passage, Jefferson refers consistently to "Congress," suggesting that both houses of Congress are subject to the same analysis. Elsewhere, he shows full awareness of the fact that because the Constitution makes numerous distinctions between the two bodies, it is conceivable that different rules would apply to each of them. Where that is true, however, he explicitly distinguishes between the House and the Senate, as he does in a subsequent passage that refers back to the passage quoted in footnote 5, and that states an important qualification to the principle that the end of a session terminates all business before the legislative body:

---

merged in the higher authority of the Constitution, and the meeting will be under that, and not under their adjournment. So far we have fixed landmarks for determining sessions.

William Holmes Brown, *Constitution, Jefferson's Manual and Rules of the House of Representatives*, H.R. Doc. No. 101–256, at 291–92 (1991) (*"Jefferson's Manual"*)(citations omitted).

[6] As suggested above, Jefferson's reference to the "end of the session" is satisfied by a *sine die* adjournment. *See The Pocket Veto Case*, 279 U.S. at 681; Riddick, *supra*, at 56.

> When it was said above that all matters depending before the Parliament were discontinued by the determination of the session, it was not meant for judiciary cases depending before the House of Lords, such as impeachments, appeals, and writs of error. These stand continued, of course, to the next session. . . .

> Impeachments stand, in like manner, continued before the Senate of the United States.

*Jefferson's Manual* at 294. This passage confirms the view that in the earlier passage Jefferson was relying upon Parliamentary rules to develop rules applicable to both houses of Congress because it shows that he did not hesitate to point out cases where a rule applied to only one house of the legislature in particular. In addition, and quite separately, by calling attention to the Senate's post-adjournment authority to exercise its constitutionally-derived *judicial* powers to try impeachments as a special exception, the passage confirms that Jefferson did not believe that the Senate could exercise its constitutionally-derived *legislative* powers after an adjournment *sine die*. Because Congress's authority to coerce by subpoena the production of information derives from its constitutionally-delegated authority to legislate, Jefferson must have intended to convey that such authority ceases upon an adjournment *sine die*.[7]

Second, even assuming with *McGrain* that the Senate's status as a continuing body dictates that a legal controversy relating to an action taken by the Senate of a previous Congress (i.e., before the adjournment *sine die* of that Congress) under a then-existing Senate subpoena cannot be mooted merely by the adjournment *sine die* of the previous Congress,[8] such fact does not compel the conclusion that the legal effectiveness of compulsory Senate process extends beyond a *sine die* adjournment. A case will become moot when the relief sought by the plaintiff would, if granted, confer no tangible benefit. *See Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). The Court's discussion of mootness in *McGrain* thus centered on whether the Senate, having initially exercised its constitutionally-based contempt authority during the session in which it had issued the subpoena, was capable of repeating such action. *See McGrain*, 273 U.S. at 181–82. As demonstrated by the Court's discussion in *McGrain*, a mootness determination entails a different analysis than that required to resolve whether a party is empowered in the first instance to bring a suit or take a specified action.

For these reasons, the Court's mootness discussion in *McGrain* does not, in our view, resolve the legal status of a Senate subpoena issued after a *sine die*

---

[7] The House Parliamentarian appears to agree with this view. In the annotation to the Parliamentarian's presentation of *Jefferson's Manual*, he refers to the passage cited in *McGrain* as "Sitting of committees in recess, and creation of commissions to sit after *Congress* adjourns." *Jefferson's Manual* § 589 (annotation) at 291 (emphasis added).

[8] In *McGrain*, the Senate took action to enforce its subpoena prior to its adjournment. *McGrain*, 273 U.S. at 153–54.

adjournment, and the passage from *Jefferson's Manual* relied upon in *McGrain* to distinguish the Senate from the House actually equates the two bodies for purposes relevant to this analysis.[9] In fact, we believe that the Court's previous analyses of Congress's subpoena and contempt power support the view that a congressional subpoena issued after an adjournment *sine die* has no legal effect.[10]

## II. CONCLUSION

For the reasons discussed above, we conclude, consistent with our 1982 opinion, that a congressional subpoena issued after an adjournment *sine die* lacks any legal force and effect and does not impose any legal obligation to comply with the subpoena.

CHRISTOPHER SCHROEDER
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[9] As stated above, our analysis concludes, consistent with *Anderson*, 19 U.S. at 231, *The Pocket Veto Case*, 279 U.S. at 681, and *Jefferson's Manual*, that the legislative power of a house of Congress ends upon the end of a session and that its adjournment *sine die* constitutes the end of a session. *See* text at note 4, and note 6, above. Therefore, we reject as untenable the apparent suggestion of the court in *Harris v. Board of Governors*, 938 F.2d 720, 723 (7th Cir. 1991) that Congress's ability to exert legislative power may continue beyond that point. In any event, because the court in *Harris* determined that the case became moot upon appeal, *see id.* at 720, such dicta has no binding effect. *See id.* at 725 (Ripple, J., concurring in the court's decision that the case became moot on appeal and noting that the court's dicta "does not constitute the law of the circuit.").

[10] Our conclusion that Congress's constitutional authority to coerce by subpoena the tendering of requested information lapses upon an adjournment *sine die* is not intended to call into question the executive branch's longstanding practice of responding voluntarily to information requests from congressional committees (whether by letter or subpoena) during adjournment *sine die* periods. The conclusion that as a matter of law Congress lacks authority after adjournment *sine die* to impose obligations or sanctions outside the legislative branch — whether by legislation, subpoena or contempt order — does not mean that Congress cannot make a request for information or that the executive branch cannot, as a matter of policy (based on the comity afforded another branch of government), respond voluntarily to such a request.