## MacCRACKEN v. JURNEY.

### No. 6166.

United States Court of Appeals for the District of Columbia.

Argued May 7, 1934.

Decided July 9, 1934.

GRONER and HITZ, Associate Justices, dissenting.

Frank J. Hogan and Edmund L. Jones, both of Washington, D. C., for appellant.

Leslie C. Garnett, U. S. Atty., and Harry L. Underwood, Asst. U. S. Atty., both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

ROBB, Associate Justice.

Appeal from an order in the Supreme Court of the District, on a petition for writ of habeas corpus filed by appellant (hereinafter designated as petitioner) and the demurrer of appellee (hereinafter designated as respondent) thereto, dismissing the petition and remanding petitioner to the custody of respondent.

Since respondent demurred to the petition, the material facts there stated must be taken as true. They are substantially as follows: During the second session of the Seventy-Second Congress the Senate of the United States on February 25, 1933, adopted Senate Resolution 349, which authorized an investigation of all existing contracts for the carriage of air and ocean mail. Petitioner is a lawyer and at various times during the past ten years had been employed as such by individuals and corporations engaged in the operation of airplanes over designated routes and otherwise, and had rendered to his clients professional services, some of which related to air mail contracts, but none of which related to ocean mail contracts.

On January 31, 1934, there was served on petitioner a subpœna duces tecum, issued by the committee of the Senate appointed under the aforesaid Senate Resolution 349, commanding petitioner to appear before the committee, "instanter, at 12:30 p. m.," and to "bring all books of account, bank pass books, canceled checks, check stubs, deposit slips, papers, memorandums, correspondence, maps, copies of telegrams relating to air-mail and ocean-mail contracts."

Under the filing system in petitioner's office in Washington, the file folders containing the correspondence and documents relating to matters in which petitioner was employed by air mail contractors, included papers relating to other matters.

In compliance with the subpœna, petitioner appeared before the committee on January 31, 1934, and advised the committee that he was ready to produce all papers called for in the subpœna, excepting only communications between himself, as attorney, and his clients; that, as petitioner understood the law, communications, whether oral or written, between attorney and client relating to the subject-matter of the attorney's employment are privileged; and that it is not within the power of the attorney to waive such privilege, which belongs exclusively to the client. Thereupon petitioner was sworn as a witness and testified, in substance, inter alia, to the names of air mail operators whom he had represented as attorney; that he had never represented any one having an ocean mail contract; and testified to the character of services rendered by him to his clients; and to the character of the communications between himself and his clients which he considered privileged.

Thereupon the chairman of the committee inquired of petitioner if he would telegraph to his clients on the subject of the committee's subpœna. Agreeing to this suggestion, petitioner prepared a telegram to each of his clients and submitted the same to the chairman of the committee, who gave his approval thereto. These telegrams petitioner sent forthwith on January 31 to each and every client who at any time, so far as petitioner's knowledge extended, had any air mail contract or contracts. These telegrams requested the clients to advise petitioner by wire if they would waive their privilege and authorize him to make communications between them, as attorney and client, available to the Senate committee. Thereupon petitioner, as promptly as practicable, produced and made available to the committee all papers of every kind and description in his possession, power, or control, in any way relating to air mail contracts, except those alleged to be embraced within his clients' privilege.

On February 1st petitioner informed the committee that he had been advised by telegraph that certain of his clients had waived the privilege attached to their communications between them and petitioner, and on that date petitioner produced to the committee all papers of those clients relating to air mail contracts. On the same day, also, petitioner addressed and sent to clients who had not responded to his request telegrams indicating the necessity of immediate reply regarding the waiver of privilege, as the committee had called upon him to give that information the next morning. On the following day (February 2, 1934) petitioner was again called before the committee under the aforesaid subpœna and testified to the receipt of waivers from all but four of his air mail clients, and that all papers of those clients who had waived their privilege were immediately available to the committee. Petitioner requested additional time to obtain waivers from the four remaining clients. This request was refused; the committee ruling that the privilege asserted by petitioner did not relieve him of the duty of producing all papers and documents required by the subpœna.

Petitioner insisting that he could not waive the privilege attached to the communications passing between him, as an attorney, and his clients without the consent of the clients, the matter was on February 2d reported to the Senate by the chairman of the committee (Senate Report No. 254, 2d Sess. 73d Cong.). The Senate thereupon passed Senate Resolution 169, 73d Cong., 2d Sess., which directed the issuance of a warrant by the President of the Senate to take petitioner into custody and produce him before the bar of the Senate, and commanding petitioner to "bring with him the correspondence, memoranda, books, files, and records referred to and then and there to answer such questions pertinent to the matter under inquiry with reference to facts regarding correspondence, memoranda, books, and files as the Senate may propound," and to keep petitioner in custody to await the further action of the Senate. The resolution affirmed that the testimony of the petitioner and the production of correspondence, records, files, and books were material and necessary in order that the committee (select committee, elected pursuant to Senate Resolution 349, 72d Cong., 2d Sess.) might properly execute the functions imposed upon it "and obtain information necessary as a basis for such legislation as the Senate may deem necessary concerning ocean- and air-mail contracts."

Thereupon the warrant was issued and petitioner was arrested by respondent (Sergeant at Arms of the Senate) on the afternoon of February 2, 1934. The Senate not then being in session, petitioner was paroled in the custody of his counsel, to appear at the bar of the Senate in the custody of respondent at noon on February 5, 1934.

Shortly prior to the service of the warrant on February 2d, petitioner received waivers from all his remaining clients who had not responded to his telegrams. Promptly, on receiving such waivers, petitioner notified the chairman of the committee, and made available to the committee under the command of its subpœna all papers in his possession relating to air mail contracts.

One of the addressees of petitioner's telegrams of January 31, 1934, was L. H. Brittin, vice president of Northwest Airways, Inc., by which company petitioner was employed from March to November, 1933. On February 1, 1934, Brittin called at the office of the law firm of MacCracken & Lee in Washington, of which petitioner was senior partner. Subsequent to the issuance of the subpœna of the Senate committee petitioner had not seen Brittin nor had there been any communication between him and petitioner. Upon the occasion of his call he saw petitioner's partner, and advised Lee that he had received petitioner's telegram; that, as Lee knew, he, Brittin, had on occasions during the summer of 1933 been permitted as an accommodation to use Lee's office, and that while there in the summer he had dictated and had typed letters of an entirely personal nature, having no relation to air mail contracts, copies of which letters he had permitted to remain in the folder of the firm's files in which their papers relating to the business of the Northwest Airways, Inc., were contained; and that he desired to remove from the files these personal papers. Thereupon Lee handed to Brittin the folder referred to, and in the presence of Lee he removed therefrom five or six papers. Lee did not see the contents of these papers, but was advised by Brittin that they did not relate to air mail contracts and were exclusively personal to himself. Petitioner had no knowledge whatever either of Brittin's call or what had occurred during that call until after Brittin's departure. On February 3, 1934, Brittin appeared as a witness before the Senate committee, corroborated petitioner's statement, and further testified that the letters he had removed were purely personal and had "no relation whatever to the matters under consideration" by the committee, and that he had destroyed them. Petitioner testified fully before the Senate committee on February 2d concerning his lack of knowledge of the taking and destruction of papers by Brittin.

Another addressee of petitioner's telegrams of January 31st was Harris M. Hanshue, president of the Western Air Express, New York City, by which company petitioner was employed as attorney from December 1, 1929, to September 1, 1932. On February 1, 1934, Hanshue by telephone informed petitioner that before his company could make its decision on the subject of the waiver, he desired an opportunity to look over the papers contained in petitioner's files and also to examine certain personal papers, not relating to air mail contracts, copies of which he believed to be in such files; that he was sending to petitioner's office for that purpose Gilbert Givven, known to petitioner as one-time secretary to Hanshue and as Washington representative of the Western Air Express. Thereupon Givven made an appointment to call at petitioner's office, and

did call on the afternoon of February 1st. Petitioner permitted an examination of the file folders by Givven and permitted Givven to take therefrom, to be delivered to Hanshue, certain papers not relating to air mail contracts. Among these papers removed were some which did relate to that subject, but which petitioner did not recognize at the time of the removal. On petitioner's appearance before the Senate committee on February 2d he testified fully with respect to these facts. Immediately following his appearance on that date he communicated with the Western Air Express and requested the immediate return of all papers taken by Givven as aforesaid. On February 3d Givven appeared as a witness before the Senate committee and then and there produced each and every paper taken by him from petitioner's office on February 1st. All of these papers were delivered by Givven to the Senate committee, and all have been in the possession of the committee since February 3d and are now in its possession.

On February 5, 1934, petitioner and his counsel appeared at the office of the Sergeant at Arms of the Senate, petitioner being then and there ready to appear at the bar of the Senate in response to the warrant under which he had been arrested and to produce the papers included within the subpœna and to answer such questions pertinent to the matter under inquiry as the Senate might propound. Without being required or afforded an opportunity to appear at the bar of the Senate, petitioner was on that day by resolution of the Senate ordered to be released from custody under Senate Resolution 169 and under the warrant issued and served on February 2. Thereupon petitioner was released from custody. Prior to his release from custody under Senate Resolution 169 petitioner had produced and delivered to the Senate committee, "to the best of his ability, knowledge and belief, every paper of every kind and description in his possession, or under his control, relating in any way to air-mail" contracts, and since February 5, 1934, such papers "have been and now are" in its possession.

On February 5 the Senate adopted Senate Resolution 172, 73d Cong., 2d Sess. It provided that a citation issue directing petitioner, and Brittin, Givven, and Hanshue "to show cause why they should not be punished for contempt of the Senate, on account of the destruction and removal of certain papers, files, and memoranda from the files of William P. MacCracken, Junior, as shown by the report of the special Senate committee investigating ocean- and air-mail contracts." Pursuant to that resolution, on February 6th the citation issued and was served on petitioner by respondent, commanding petitioner to appear before the bar of the Senate on Friday, February 9, 1934, at 12 o'clock noon, to show cause why he should not be punished for contempt on the grounds stated in the resolution.

On February 8 the Senate adopted a mode of procedure and rules for the trial of petitioner at its bar.

Petitioner did not appear at the bar of the Senate on February 9 as directed, but addressed a communication to the Senate, which was read in open session on that day. In this communication petitioner stated in detail the facts relating to his then knowledge of the so-called "Brittin and Givven incidents," and, inter alia, said: "To appear at the bar of the Senate in response to the above-mentioned citation would be to give assent to the exercise by your honorable body of powers which do not constitutionally belong to it and to voluntarily aid in permitting it to violate rights guaranteed to me as a citizen of the United States under the Constitution of my country."

Upon the reading of petitioner's communication, the Senate on February 9 ordered the issuance of a warrant and his immediate arrest. The warrant was issued directing the respondent, as Sergeant at Arms of the Senate, forthwith to arrest and take into custody and bring to the bar of the Senate the petitioner for the purpose set forth in Senate Resolution 172.

On February 12, 1934, respondent, acting under the authority of the warrant, arrested petitioner.

Challenging the constitutional power of the Senate under the stated facts so to arrest and restrain him, petitioner in the court below filed a petition seeking the issuance of a writ of habeas corpus. The writ issued; whereupon respondent filed a demurrer to the petition on the ground "that the same is insufficient in law." After hearing, the court below, without opinion, discharged the writ and remanded petitioner to the custody and control of respondent.

Petitioner concedes that Senate Resolution 169 and the warrant served thereunder were adopted and issued in the performance of a legislative function, but contends that Senate Resolution 172 and the warrant served

thereunder were adopted and issued in the attempted exercise of a judicial function.

■■■ It is established law that the two Houses of Congress separately possess not only such powers as are expressly granted to them by the Constitution, but such auxiliary powers as are necessary and appropriate to make effective the express powers; that the power of inquiry, with process to enforce it, is an essential and appropriate auxiliary to the exercise of the legislative function. Marshall v. Gordon, 243 U. S. 521, 37 S. Ct. 448, 61 L. Ed. 881, L. R. A. 1917F, 279, Ann. Cas. 1918B, 371; McGrain v. Daugherty, 273 U. S. 135, 47 S. Ct. 319, 71 L. Ed. 580, 50 A. L. R. 1; Sinclair v. United States, 279 U. S. 263, 49 S. Ct. 268, 73 L. Ed. 692.

In the Marshall Case the question involved was whether the House of Representatives had exceeded its power in punishing as for contempt of its authority a person, not a member, who had written and sent to the chairman of one of its committees an ill-tempered and irritating letter respecting the action and purposes of the committee. It was ruled that it had.

The Daugherty Case involved the power of the Senate, through its own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution, and whether in the case before it the process was being employed to obtain testimony for that purpose. The court determined each issue in the affirmative.

In the Sinclair Case the court sustained a conviction of the defendant under section 102, R. S. (2 USCA § 192), for refusing to answer questions propounded to him before a committee of the Senate.

In the Marshall Case the court observed that the auxiliary power rests upon the implication that the right has been given to do that which is essential to the execution of some other and substantive authority expressly conferred. "The power is therefore but a force implied to bring into existence the conditions to which constitutional limitations apply. It is a means to an end, and not the end itself. Hence it rests solely upon the right of self-preservation to enable the public powers given to be exerted." 243 U. S. at page 541, 37 S. Ct. 448, 453, 61 L. Ed. 881, L. R. A. 1917F, 279, Ann. Cas. 1918B, 371. The court pointed out that in Anderson v. Dunn, 6 Wheat. 204, 231, 5 L. Ed. 242, the answer to the question as to the extent of the implied power of legislative assemblies to deal with contempt was declared to be "the least possible power adequate to the end proposed." The court then said (243 U. S. at page 542, 37 S. Ct. 448, 453, 61 L. Ed. 881, L. R. A. 1917F, 279, Ann. Cas. 1918B, 371): "Without undertaking to inclusively mention the subjects embraced in the implied power, we think from the very nature of that power it is clear that it does not embrace punishment for contempt as punishment, since it rests only upon the right of self-preservation; that is, the right to prevent acts which, in and of themselves, inherently obstruct or prevent the discharge of legislative duty or the refusal to do that which there is an inherent legislative power to compel in order that legislative functions may be performed." The court further pointed out that in its historical review it had been able to discover "no single instance where, in the exertion of the power to compel testimony, restraint was ever made to extend beyond the time when the witness should signify his willingness to testify *the penalty or punishment for the refusal remaining controlled by the general criminal law.*" (Italics ours.) See sections 101–104 and 859, Rev. Stat.; sections 191–194, tit. 2; and section 634, tit. 28, U. S. C. (2 USCA §§ 191–194; 28 USCA § 634). The court also said (243 U. S. at pages 544, 545, 37 S. Ct. 448, 454, 61 L. Ed. 881, L. R. A. 1917F, 279, Ann. Cas. 1918B, 371) that where a particular act because of its interference with the right of self-preservation comes within the jurisdiction of either House to deal with directly under an implied power to preserve their functions "and therefore without resort to judicial proceedings under the general criminal law, we are of opinion that authority does not cease to exist because the act complained of had been committed when the authority was exerted. * * * On the contrary, when an act is of such a character as to subject it to be dealt with as a contempt under the implied authority, we are of opinion that jurisdiction is acquired by Congress to act on the subject, and therefore there necessarily results from this power the right to determine, in the use of legitimate and fair discretion, *how far from the nature and character of the act there is necessity for repression to prevent immediate recurrence;* that is to say, the continued existence of the interference or obstruction to the exercise of the legislative power. And of course in such case, as in every other, unless there be manifest an absolute disregard of discretion and

a mere exertion of arbitrary power coming within the reach of constitutional limitations, the exercise of the authority is not subject to judicial interference." (Italics ours.)

But in the Marshall Case, as in Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377 (which involved a contempt proceeding instituted by the House), the court held that the House had exceeded its power. If controlling limitations or restrictions are disregarded, the decisions in the two cases just alluded to "point to admissible measures of relief. And it is a necessary deduction from the decisions in Kilbourn v. Thompson and In re Chapman [166 U. S. 661, 17 S. Ct. 677, 41 L. Ed. 1154] that a witness rightfully may refuse to answer where the bounds of the power are exceeded or the questions are not pertinent to the matter under inquiry." Mc-Grain v. Daugherty, 273 U. S. 135, 176, 47 S. Ct. 319, 329, 71 L. Ed. 580, 50 A. L. R. 1.

In the Marshall Case the court finally stated that the conclusions reached brought about "a concordant operation of all the powers of the legislative and judicial departments of the government, express or implied, as contemplated by the Constitution"; that State Constitutions written before the adoption of the Constitution of the United States substituted, for the intermingling of the legislative and judicial power to deal with contempt as it existed in the House of Commons, "a system permitting the dealing with that subject in such a way as to prevent the obstruction of the legislative powers granted and secure their free exertion, and yet, at the same time, not substantially interfere with the great guaranties and limitations concerning the exertion of the power to criminally punish,—a beneficent result which additionally arises from the golden silence by which the framers of the Constitution left the subject to be controlled by the implication of authority resulting from the powers granted." 243 U. S. at page 546, 37 S. Ct. 448, 455, 61 L. Ed. 881, L. R. A. 1917F, 279, Ann. Cas. 1918B, 371.

In the light of the controlling authorities to which we have referred, we come to consider the facts in the present case. As we have already observed, petitioner concedes, as indeed he must, that the Senate was acting within its constitutional limitations down to the adoption of Senate Resolution 172 and petitioner's arrest thereunder. The stated purpose of Senate Resolution 169 was to compel the appearance and testimony of petitioner in order that the committee might properly execute the functions imposed upon it and obtain information necessary as a basis for legislation. Petitioner alleges, and the demurrer admits, that, prior to the adoption of Senate Resolution 172 and petitioner's arrest thereunder, he had produced and delivered to the Senate every paper of every kind and description in his possession or under his control relating in any way to air mail contracts; that he had appeared as a witness before the Senate committee and answered all questions propounded to him; and that he stands ready to appear before the committee at any time and to answer all pertinent and material questions.

The declared purpose of Senate Resolution 172 was to command the appearance of petitioner, and Brittin, Givven, and Hanshue to show cause why they should not be punished for contempt of the Senate, "on account of the destruction and removal of certain papers, files, and memoranda from the files of William P. MacCracken, Junior, after a subpena had been served upon William P. MacCracken, Junior. * * *" The purpose was not the production of documents nor to compel the testimony of a witness. This is made more manifest by the inclusion in the resolution of Brittin, Givven, and Hanshue, who had a part in the removal or destruction of the papers alluded to in the resolution. There is no suggestion that the purpose of this resolution was other than the punishment of the named individuals for the part they had taken in the removal or destruction of papers. While petitioner's act in permitting Givven to take from his files papers covered by the subpoena was ill-advised and well calculated to arouse suspicion, those papers, prior to the adoption of Senate Resolution 172, had all been returned and delivered to the Senate committee and, as the petition alleges, "are now in its possession." On the facts admitted, petitioner was not responsible for the taking and destruction of papers by Brittin, but, even assuming that he was, his punishment by the Senate would operate "not as a remedy coercive in its nature, but solely as punishment for the completed act of disobedience." Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 31 S. Ct. 492, 498, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874. There is no suggestion in the record that at the time of the adoption of Senate Resolution 172 any further or additional information or papers were in the possession of petitioner and were being withheld. Nor is there any suggestion

that other and additional information was required. Indeed, concurrently with the adoption of Senate Resolution 172, the release of petitioner from custody under Senate Resolution 169, which in its preamble specifically stated that the testimony and papers of petitioner were necessary in the discharge of the Senate's legislative function, indicates that the necessity therefor had ceased to exist or that the information had been furnished to the Senate. In other words, the Senate thereafter was not seeking, by coercion or otherwise, the furnishing of information through testimony or the production of papers; its inquiry in aid of its legislative function had ended so far as petitioner was concerned. How, then, in reason can it be said (as in the Marshall Case, 243 U. S. at page 545, 37 S. Ct. 448, 455, 61 L. Ed. 881, L. R. A. 1917F, 279, Ann. Cas. 1918B, 371) that "there is necessity for repression to prevent immediate recurrence" of the act? Is it not plain that the sole purpose of the Senate in the adoption of Senate Resolution 172 and petitioner's arrest thereunder was punishment, and punishment as such?

Time and again it has been declared that Congress possesses legislative power in the amplest degree to provide for prosecution and punishment under the criminal law for any and every wrongful act. Sections 101–104 and 859 of the Revised Statutes were enacted under that power and show plainly that Congress intended thereby "to subject defaulting and contumacious witnesses to indictment and punishment in the courts, and thereby to enable either house to exert the power of inquiry 'more effectually.'" McGrain v. Daugherty, 273 U. S. 135, 168, 47 S. Ct. 319, 326, 71 L. Ed. 580, 50 A. L. R. 1.

Unless there is to be an intermingling of the legislative and judicial power to deal with contempt, thereby rendering it possible in all cases as a matter of legislative power summarily to try one thus accused without subjecting him to the statutory modes of trial provided for criminal offenses, protected by the limitations and safeguards of the Constitution, then we must and do declare that the Senate is without jurisdiction to inflict punishment on the petitioner under Senate Resolution 172.

The judgment therefore is reversed, and the cause remanded, with directions to discharge petitioner from custody.

Reversed and remanded.

GRONER, Associate Justice (dissenting).

I am unable to concur in the conclusion reached by the court in this case. I shall state the reasons of my dissent briefly.

The essential facts to an understanding of the case are fully set out in the opinion, and it is not necessary or desirable to repeat them here. The sole question involved on this appeal is the power of the Senate to arrest and bring before it for punishment a private citizen who, after being served with subpœna requiring him to produce his files relating to a matter then properly under investigation, allows documents in the files to be withdrawn so that he cannot comply with the terms of the subpœna.

The opinion of this court holds, and properly holds, that the Senate had a right to require the production of the documents in question, and likewise, that the Senate had the power to punish petitioner if he refused to produce them; but also holds that, since the offense charged against petitioner is not the refusal to deliver, but the doing of an act which made delivery by him impossible, the Senate had no authority to inflict punishment, since punishment in such case would not be coercive but punitive.

The opinion relies upon Marshall v. Gordon, 243 U. S. 521, 37 S. Ct. 448, 451, 61 L. Ed. 881, L. R. A. 1917F, 279, Ann. Cas. 1918B, 371. In that case, as in the others cited in the opinion, the rule is stated to be that in addition to the express powers of Congress under the Constitution in relation to the punishment of its own members, each House has implied power to punish outsiders for contempts; that this power rests upon the legislative power granted to Congress, and that that which is "reasonably appropriate and relevant to the exercise of a granted power [is] to be considered as accompanying the grant." Speaking of this implied power, the Supreme Court in Marshall v. Gordon (at page 541 of 243 U. S., 37 S. Ct. 448, 453) said the power grows out of the implication that the right has been given to do that which is essential to the execution of some other and substantive authority expressly conferred. "The power is therefore but a force implied to bring into existence the conditions to which constitutional limitations apply. It is a means to an end, and not the end itself. Hence it rests solely upon the right of self-preservation to enable the public powers given to be exerted." It has therefore been decided (McGrain v. Daugherty, 273 U. S. 135,

47 S. Ct. 319, 71 L. Ed. 580, 50 A. L. R. 1) that the power to punish for contempt embraces the power to compel the production of documents in order that the legislative functions may be performed and, for the same reason, to compel a witness to testify and to punish him for contempt either for refusal to testify or to produce documents; "the right to prevent acts which, in and of themselves, inherently obstruct or prevent the discharge of legislative duty or the refusal to do that which there is an inherent legislative power to compel." But in the opinion of this court this implied power is held not to comprehend also the power to impose punishment for a past act, even though the result is to prevent the discharge of a legislative duty where the effect is to make the legislative purpose futile. The reasoning to support this view, I think, is unsound. I am not unmindful of the fact that Marshall v. Gordon contains an "argumentative dictum" to support the conclusion, but the facts on which that case rests are wholly different from those present here.

In that case the letter which Marshall published was held not to amount to obstruction. In this case petitioner was cited to appear and show cause why he should not be punished for contempt on account of the destruction and removal, after service of the subpœna, of certain papers, files, and memoranda, which the Senate believed to be necessary in the discharge of its legislative duties. To say at one moment that the power exists to punish for failure to deliver papers, and then to say that it is lost if the contumacy of the witness results in destruction rather than in deliberate withholding, seems to me to be both inharmonious and absurd. In the investigation then under way, the Senate was proceeding to obtain information in aid of legislation. It demanded the production of certain papers, of which petitioner had possession. Petitioner, when summoned to produce the papers, explained that he could not do so because he had allowed them to be removed by a client. Did this act of petitioner, which made compliance with the subpœna impossible, convert the contempt into an offense for which punishment could only be imposed, if at all, by another tribunal? I can think of no good reason to suppose it did. The answer, it seems to me, depends upon the question, whether the act complained of tended to obstruct the free exercise by the Senate of its legislative functions. If it did, manifestly it was a contempt of the authority which had a right to require it to be done. To admit this and then to say that, because the nature of the act done made compliance impossible, the authority to impose punishment for the recalcitrancy was lost, appears to me to establish a distinction destructive of the purpose out of which the right arises and to make the power itself impotent and fruitless. In the Marshall Case the power of the Congress, or of either House, to punish for contempts is said to arise out of the necessity of "self-preservation." That term implies power from within—the intrinsic capacity of self-vindication, and this element or quality is inherent because without it, the right to do the things necessary to carry out the powers given would be dependent upon extraneous circumstances and outside agencies. Considered in this view, it seems to me to follow that there can be no real self-preservation in a case in which an admitted right is subject to successful challenge in any other tribunal than the one in which the right inheres. Nor am I willing to assent to the proposition, that, because the power is coercive, that is to say, in aid of a pending investigation or of legislation, it is any the less complete or is exhausted by the conclusion of the investigation or the exaggeration of the offense by the offender. To admit such a proposition would seem to me to be altogether destructive of the power.

That the right, as well as the power, is limited by constitutional safeguards for the liberty of the citizen and that it may not be exercised capriciously or arbitrarily, or the power of the courts to inquire into its exercise questioned, is one thing, but it is quite another, that the refusal to do that which there is legislative power to compel can be punished only so long as the recusant remains obdurate from unwillingness to do the thing commanded, and the right is lost in a case in which he puts it beyond his own power to obey. What has just been said is in discussion of the single legal principle involved. The justification or extenuation of the act complained of here has no place in a proceeding of this character, but, considered purely in the one aspect, whether the Senate has the power to punish for contempt where, after service of subpœna requiring the production of records, the person subpœnaed destroys the records, it is no answer, as I think, to say that the act of destruction nullifies the power of punishment inherent in the legislature, and I think it was this which, in the Marshall Case, Chief Justice White had in mind, when, after noting the instances in

which no attempt was made to impose restraint "after it became manifest that there was no room for a legislative judgment," he said: "Where a particular act, because of its interference with the right of self-preservation, comes within the jurisdiction of the House to deal with directly under its implied power to preserve its functions, and therefore without resort to judicial proceedings under the general criminal law, we are of opinion that authority does not cease to exist because the act complained of had been committed when the authority was exerted, for to so hold would be to admit the authority and at the same time to deny it. On the contrary, when an act is of such a character as to subject it to be dealt with as a contempt under the implied authority, we are of opinion that jurisdiction is acquired by Congress to act on the subject, and therefore there necessarily results from this power the right to determine, in the use of legitimate and fair discretion, how far from the nature and character of the act there is necessity for repression to prevent immediate recurrence; that is to say, the continued existence of the interference or obstruction to the exercise of the legislative power."

Much emphasis is laid by petitioner on the words "immediate recurrence," but I think the emphasis misplaced. The language quoted is susceptible, as I think, of only one interpretation, viz., that where the power exists and is exercised, it cannot be destroyed by the act of the person against whom it is asserted, and this, even though the further exertion of the power is obviously not in aid of the particular legislation then under consideration. And so, in my view, while the power is implied as a necessary ingredient to the discharge of the functions of Congress, that is to say, as a means of procuring information in aid of legislation, when properly exerted, it is intrinsic to the discharge of its constitutional duties which in such cases embrace the power to punish those who obstruct its proceedings both as a corrective to the individual and a deterrent to others.

I think the judgment below should be affirmed.

I am authorized by Associate Justice HITZ to say he concurs in this dissent.