## *In re* CHAPMAN, Petitioner.

### ORIGINAL.

No. 11. Original. Argued March 24, 1897. — Decided April 19, 1897.

The legislation contained in sections 102 and 104 of the Revised Statutes was originally enacted " more effectually to enforce the attendance of witnesses on the summons of either House of Congress, and to compel them to discover testimony "; and, when reasonably construed, is not open to the objection that it conflicts with the provisions of the Constitution.

Statutes should receive a sensible construction, such as will effectuate the legislative intention, and avoid, if possible, an unjust or absurd conclusion.

*Runkle* v. *United States*, 122 U. S. 543, again questioned, as it has not been approved in subsequent decisions.

Congress possesses the constitutional power to enact a statute to enforce the attendance of witnesses, and to compel them to make disclosure of evidence to enable the respective bodies to discharge their legislative functions.

While Congress cannot divest itself or either of its Houses of the inherent power to punish for contempt, it may provide that contumacy in a witness called to testify in a matter properly under consideration by either House, and deliberately refusing to answer questions pertinent thereto, shall be a misdemeanor against the United States.

THIS is a petition for a writ of *habeas corpus,* filed on leave, and a rule thereon entered, to which return was duly made.

The petition alleges as follows : That petitioner is a citizen of the United States and a resident of the city of New York, in the State of New York, and that he is now restrained of his liberty by the marshal of the United States for the District of Columbia. That on the first of October, 1894, in the Supreme Court of the District of Columbia, holding a criminal term, the grand jury empanelled in said court at said term thereof found an indictment against petitioner based on section 102 of the Revised Statutes of the United States, to which petitioner filed a demurrer alleging, among other objections, the unconstitutionality of the acts of Congress on which the indictment was based; that the demurrer was overruled and petitioner ordered to plead thereto; that the Court of Appeals

for the District of Columbia allowed an appeal from the order overruling the demurrer and subsequently affirmed it, *Chapman* v. *United States*, 5 D. C. App. 122, whereupon petitioner applied to this court for leave to file a petition for a writ of *habeas corpus*, which application was denied. *In re Chapman, Petitioner*, 156 U. S. 211. That thereafter petitioner filed a petition in the Court of Appeals for a writ of prohibition to prevent the trial court from unlawfully assuming jurisdiction to try petitioner on said indictment, which petition was denied, and thereupon petitioner duly prosecuted an appeal and writ of error to this court from such order denying said petition, which are still pending, this court having refused to advance the cause; and having also declined to stay the proceedings below. That, thereupon, the trial of petitioner under the indictment was proceeded with and a verdict of guilty returned; motions in arrest of judgment and for new trial were made and overruled; and on February 1, 1896, the trial court entered its judgment and sentence, on said verdict, that petitioner be imprisoned in the jail of the District of Columbia for the period of one month from date of arrival, and to pay a fine of one hundred dollars, from which judgment and sentence petitioner prosecuted an appeal to the Court of Appeals; that court affirmed the judgment and sentence of the trial court, *Chapman* v. *United States*, 8 D. C. App. 302, but allowed a writ of error to remove the cause to this court for review, which writ was dismissed for want of jurisdiction. *Chapman* v. *United States*, 164 U. S. 436.

That petitioner was then surrendered in open court by his bondsmen and committed into the custody of the United States marshal for the District, who now holds and confines him and deprives him of his liberty.

The petition further alleged that the act of Congress under which petitioner was prosecuted was unconstitutional, and the imprisonment of petitioner unlawful, on various grounds set forth at length.

Petitioner attached duly certified copies of the record and proceedings, judgment and sentence, under the aforesaid in-

dictment against him, and prayed that the same be considered in connection with the petition; and also referred to the record in the matter of the application of petitioner for a writ of prohibition.

The indictment averred that the House of Representatives had passed a certain tariff bill, which was pending in the Senate, with a very large number of proposed amendments thereto, during the months thereafter mentioned, and, among them, certain amendments providing for duties on sugar different from the provisions of the bill as it had been sent to the Senate, the adoption or rejection of which by the Senate would materially affect the market value of the stock of the American Sugar Refining Company. That the Senate adopted a preamble and resolutions raising a special committee and clothing it with full power of investigation into certain charges, made in designated newspapers, that members of the Senate were yielding to corrupt influences in the consideration of said legislation. That the investigation was commenced, and, in the course of it, petitioner, being a member of a firm of stock brokers in the city of New York, dealing in the stock of the American Sugar Refining Company, appeared as a witness, and was asked whether the firm of which the witness was a member had bought or sold what were known as sugar stocks during the month of February, 1894, and after the first day of that month, for or in the interest, directly or indirectly, of any United States Senator; had the firm, during the month of March, 1894, bought or sold any stocks or securities, known as sugar stocks, for or in the interest, directly or indirectly, of any United States Senator; had the said firm during the month of April done so; had the said firm during the month of May done so; was the said firm at that time carrying any sugar stock for the benefit of or in the interest, directly or indirectly, of any United States Senator. But petitioner then and there wilfully refused to answer each of the questions so propounded, all of which were pertinent to the inquiry then and there being made by the said committee under the resolutions aforesaid.

*Mr. George F. Edmunds* and *Mr. A. J. Dittenhoefer* for petitioner. *Mr. Jeremiah M. Wilson* was on their brief.

*Mr. Solicitor General*, for the United States, opposing.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

It is insisted that the Supreme Court of the District of Columbia, sitting as a criminal court, had no jurisdiction; that the questions were not authorized under the Constitution; and that the act of Congress under which petitioner was indicted and tried is unconstitutional.

Sections 102, 103 and 104, and section 859, of the Revised Statutes, are as follows:

"SEC. 102. Every person who, having been summoned as a witness by the authority of either House of Congress, to give testimony or to produce papers upon any matter under inquiry before either House, or any committee of either House of Congress, wilfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than one thousand dollars nor less than one hundred dollars, and imprisonment in a common jail for not less than one month nor more than twelve months.

"SEC. 103. No witness is privileged to refuse to testify to any fact, or to produce any paper, respecting which he shall be examined by either House of Congress, or by any committee of either House, upon the ground that his testimony to such fact or his production of such paper may tend to disgrace him or otherwise render him infamous.

"SEC. 104. Whenever a witness summoned as mentioned in section one hundred and two fails to testify, and the facts are reported to either House, the President of the Senate or the Speaker of the House, as the case may be, shall certify the fact under the seal of the Senate or House to the district attorney for the District of Columbia, whose duty it shall be to bring the matter before the grand jury for their action."

" SEC. 859. No testimony given by a witness before either House, or before any committee of either House of Congress, shall be used as evidence in any criminal proceeding against him in any court, except in a prosecution for perjury committed in giving such testimony. But an official paper or record produced by him is not within the said privilege."

These sections were derived from an act of January 24, 1857, entitled " An act more effectually to enforce the attendance of witnesses on the summons of either House of Congress, and to compel them to discover testimony," 11 Stat. 155, c. 19,[1] as amended by an act entitled "An act amending the provi-

---

[1] " That any person summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter before either House, or any committee of either House of Congress, who shall wilfully make default, or who, appearing, shall refuse to answer any question pertinent to the matter of inquiry in consideration before the House or committee by which he shall be examined, shall in addition to the pains and penalties now existing, be liable to indictment as and for a misdemeanor, in any court of the United States having jurisdiction thereof, and on conviction, shall pay a fine not exceeding one thousand dollars and not less than one hundred dollars, and suffer imprisonment in the common jail not less than one month nor more than twelve months. ·

" SEC. 2. That no person examined and testifying before either House of Congress, or any committee of either House, shall be held to answer criminally in any court of justice, or subject to any penalty or forfeiture for any fact or act touching which he shall be required to testify before either House of Congress or any committee of either House as to which he shall have testified whether before or after the date of this act, and that no statement made or paper produced by any witness before either House of Congress or before any committee of either House, shall be competent testimony in any criminal proceeding against such witness in any court of justice; and no witness shall hereafter be allowed to refuse to testify to any fact or to produce any paper touching which he shall be examined by either House of Congress, or any committee of either House, for the reason that his testimony touching such fact or the production of such paper may tend to disgrace him or otherwise render him infamous: *Provided*, That nothing in this act shall be construed to exempt any witness from prosecution and punishment for perjury committed by him in testifying as aforesaid.

" SEC. 3. That when a witness shall fail to testify, as provided in the previous sections of this act, and the facts shall be reported to the House, it shall be the duty of the Speaker of the House or the President of the Senate to certify the fact under the seal of the House or Senate to the

sions of the second section of the act of January twenty-fourth, eighteen hundred and fifty-seven, enforcing the attendance of witnesses before committees of either House of Congress," approved January 24, 1862, 12 Stat. 333, c. 11;[1] both of which are given in the margin.

From the record of the proceedings on the trial, accompanying and made part of the petition, it appears that petitioner, in declining to answer the questions propounded, expressly stated that he did not do so on the ground that to answer might expose him, or tend to expose him, to criminal prosecution; nor did he object that his answers might tend to disgrace him. Section 103 had, in fact, no bearing on the controversy in regard to this witness, and it is difficult to see how he can properly raise the question as to its constitutionality, notwithstanding section 859. And we cannot concur in the view that sections 102 and 103 are so inseparably connected that it can be reasonably concluded that if section 103 were not sustainable, section 102 would, therefore, be invalid. In other words, we do not think that there is ground for the belief that Congress would not have enacted section 102, if it had been supposed that a particular class of witnesses, to which petitioner did not belong, if they refused to answer by reason of constitutional privilege, could not be deprived of that privilege by section 103.

---

district attorney for the District of Columbia, whose duty it shall be to bring the matter before the grand jury for their action."

[1] " That the testimony of a witness examined and testifying before either House of Congress, or any committee of either House of Congress, shall not be used as evidence in any criminal proceeding against such witness in any court of justice: *Provided, however*, That no official paper. or record, produced by such witness on such examination, shall be held or taken to be included within the privilege of said evidence so as to protect such witness from any criminal proceeding as aforesaid; and no witness shall hereafter be allowed to refuse to testify to any fact, or to produce any paper touching which he shall be examined by either House of Congress, or any committee of either House, for the reason that his testimony touching such fact, or the production of such paper, may tend to disgrace him or otherwise render him infamous: *Provided*, That nothing in this act shall be construed to exempt any witness from prosecution and punishment for perjury committed by him in testifying as aforesaid."

Laying section 103 out of view, we are of opinion that sections 102 and 104 were intended, in the language of the title of the original act of January 24, 1857, "more effectually to enforce the attendance of witnesses on the summons of either House of Congress, and to compel them to discover testimony." To secure this result it was provided that when a person summoned as a witness by either House to give testimony or produce papers, upon any matter under inquiry before either House, or any committee of either House, wilfully fails to appear, or, appearing, refuses to answer "any question pertinent to the question under inquiry," he shall be deemed guilty of a misdemeanor and punished accordingly. And it was also provided that when, under such circumstances, the facts are reported to either House, the President of the Senate or the Speaker of the House, as the case may be, shall certify the fact under the seal of the Senate or House to the district attorney for the District of Columbia, that the matter may be brought before the grand jury for their action.

It is true that the reference is to "any" matter under inquiry, and so on, and it is suggested that this is fatally defective because too broad and unlimited in its extent; but nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion, *Lau Ow Bew* v. *United States*, 144 U. S. 47, 59; and we think that the word "any," as used in these sections, refers to matters within the jurisdiction of the two Houses of Congress, before them for consideration and proper for their action; to questions pertinent thereto; and to facts or papers bearing thereon. When the facts are reported to the particular House, the question or questions may undoubtedly be withdrawn or modified, or the presiding officer directed not to certify; but if such a contingency occurs, or if no report is made or certificate issued, that would be matter of defence, and the facts of report and certificate need not be set out in an indictment under the statute. In this case, we must assume that there was such report and certificate, and indeed we do not understand this to be controverted, as it could not well be in view

of the Senate proceedings as disclosed by its journal and otherwise.    Senate Journal, 53d Cong., 2d Sess. p. 238; Senate Rep. No. 477, Ib.; Cong. Rec., Ib. p. 6143.

Under the Constitution the Senate of the United States has the power to try impeachments; to judge of the elections, returns and qualifications of its own members; to determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of two thirds, expel a member; and it necessarily possesses the inherent power of self-protection.

According to the preamble and resolutions, the integrity and purity of members of the Senate had been questioned in a manner calculated to destroy public confidence in the body, and in such respects as might subject members to censure or expulsion.    The Senate, by the action taken, signifying its judgment that it was called upon to vindicate itself from aspersion and to deal with such of its members as might have been guilty of misbehavior and brought reproach upon it, obviously had jurisdiction of the subject-matter of the inquiry it directed, and power to compel the attendance of witnesses, and to require them to answer any question pertinent thereto.    And the pursuit of such inquiry by the questions propounded in this instance was not, in our judgment, in violation of the security against unreasonable searches and seizures protected by the Fourth Amendment.

In *Kilbourn* v. *Thompson,* 103 U. S. 168, among other important rulings, it was held that there existed no general power in Congress, or in either House, to make inquiry into the private affairs of a citizen; that neither House could, on the allegation that an insolvent debtor of the United States was interested in a private business partnership, investigate the affairs of that partnership, as a mere matter of private concern; and that consequently there was no authority in either House to compel a witness to testify on the subject. The case at bar is wholly different.    Specific charges publicly made against Senators had been brought to the attention of the Senate, and the Senate had determined that investigation was necessary.    The subject-matter as affecting the Senate

was within the jurisdiction of the Senate. The questions were not intrusions into the affairs of the citizen; they did not seek to ascertain any facts as to the conduct, methods, extent or details of the business of the firm in question, but only whether that firm, confessedly engaged in buying and selling stocks, and the particular stock named, was employed by any Senator to buy or sell for him any of that stock, whose market price might be affected by the Senate's action. We cannot regard these questions as amounting to an unreasonable search into the private affairs of the witness simply because he may have been in some degree connected with the alleged transactions, and as investigations of this sort are within the power of either of the two Houses they cannot be defeated on purely sentimental grounds.

The questions were undoubtedly pertinent to the subject-matter of the inquiry. The resolutions directed the committee to inquire " whether any Senator has been, or is, speculating in what are known as sugar stocks during the consideration of the tariff bill now before the Senate." What the Senate might or might not do upon the facts when ascertained, we cannot say, nor are we called upon to inquire whether such ventures might be defensible, as contended in argument, but it is plain that negative answers would have cleared that body of what the Senate regarded as offensive imputations, while affirmative answers might have led to further action on the part of the Senate within its constitutional powers.

Nor will it do to hold that the Senate had no jurisdiction to pursue the particular inquiry because the preamble and resolutions did not specify that the proceedings were taken for the purpose of censure or expulsion, if certain facts were disclosed by the investigation. The matter was within the range of the constitutional powers of the Senate. The resolutions adequately indicated that the transactions referred to were deemed by the Senate reprehensible and deserving of condemnation and punishment. The right to expel extends to all cases where the offence is such as in the judgment of the Senate is inconsistent with the trust and duty of a mem-

ber.  1 Story on Const. § 838.  Reference is there made to
the case of William Blount, who was expelled from the Senate
in July, 1797, for "a high misdemeanor entirely inconsistent
with his public trust and duty as a Senator."  The offence
charged against him, said Mr. Justice Story, was an attempt to
seduce an American agent among the Indians from his duty,
and to alienate the affections and confidence of the Indians
from the public authorities of the United States, and a nego-
tiation for services in behalf of the British government among
the Indians.  It was not a statutable offence nor was it com-
mitted in his official character, nor was it committed during
the session of Congress, nor at the seat of government.

Commenting on this case, Mr. Sergeant says in his work
on Constitutional Law, 2d ed. p. 302: "In the resolution, the
Senate declared him guilty of a high misdemeanor, though no
presentment or indictment had been found against him, and
no prosecution at law was ever commenced upon the case.
And, it seems no law existed, to authorize such prosecution."

The two Houses of Congress have several times acted upon
this rule of law, and the cases may be found, together with
debates on the general subject, in both Houses, of great
value, in Smith's Digest of Decisions and Precedents, Senate
Doc. No. 278, 53d Cong., 2d Session.  The reasons for main-
taining the right inviolate are eloquently presented in the
report of the committee in the case of John Smith, accused
in 1807 of participating in the imputed treason of Aaron Burr.
1 Hall's Am. L. Journal, 459; Smith's Digest, p. 23.

We cannot assume on this record that the action of the
Senate was without a legitimate object, and so encroach upon
the province of that body.  Indeed, we think it affirmatively
appears that the Senate was acting within its right, and it
was certainly not necessary that the resolutions should declare
in advance what the Senate meditated doing when the investi-
gation was concluded.

Doubtless certain general principles announced in *Runkle*
v. *United States*, 122 U. S. 543, 555, cited by petitioner's
counsel as conclusive, were correctly set forth, but that case
has not been approved in subsequent decisions on the same

subject, and the presumptions in favor of official action have been held to preclude collateral attack on the sentences of courts-martial, though courts of special and limited jurisdiction. *United States* v. *Fletcher*, 148 U. S. 84; *Swaim* v. *United States*, 165 U. S. 553.

Counsel contend with great ability that the law under consideration is necessarily subject to being impaled on one or the other of two horns of a dilemma, either inflicting a fatal wound. The one alternative is that the law delegates to the District of Columbia Criminal Court the exclusive jurisdiction and power to punish as contempt the acts denounced, and thus deprives the Houses of Congress of their constitutional functions in the particular class of cases. The other alternative is that if the law should be interpreted as leaving in the Houses the power to punish such acts, and vesting in addition jurisdiction in the District Criminal Court to punish the same acts as misdemeanors, then the law is invalid because subjecting recalcitrant witnesses to be twice put in jeopardy for the same offence contrary to the Fifth Amendment.

The refusal to answer pertinent questions in a matter of inquiry within the jurisdiction of the Senate, of course, constitutes a contempt of that body, and by the statute this is also made an offence against the United States.

The history of Congressional investigations demonstrates the difficulties under which the two Houses have labored, respectively, in compelling unwilling witnesses to disclose facts deemed essential to taking definitive action, and we quite agree with Chief Justice Alvey, delivering the opinion of the Court of Appeals, "that Congress possessed the constitutional power to enact a statute to enforce the attendance of witnesses and to compel them to make disclosure of evidence to enable the respective bodies to discharge their legitimate functions"; and that it was to effect this that the act of 1857 was passed. It was an act necessary and proper for carrying into execution the powers vested in Congress and in each House thereof. We grant that Congress could not divest itself, or either of its Houses, of the

essential and inherent power to punish for contempt, in cases to which the power of either House properly extended; but, because Congress, by the act of 1857, sought to aid each of the Houses in the discharge of its constitutional functions, it does not follow that any delegation of the power in each to punish for contempt was involved; and the statute is not open to objection on that account.

Nevertheless, although the power to punish for contempt still remains in each House, we must decline to decide that this law is invalid because it provides that contumacy in a witness called to testify in a matter properly under consideration by either House, and deliberately refusing to answer questions pertinent thereto, shall be a misdemeanor against the United States, who are interested that the authority of neither of their departments, nor of any branch thereof, shall be defied and set at naught. It is improbable that in any case cumulative penalties would be imposed, whether by way of punishment merely, or of eliciting the answers desired, but it is quite clear that the contumacious witness is not subjected to jeopardy twice for the same offence, since the same act may be an offence against one jurisdiction and also an offence against another; and indictable statutory offences may be punished as such, while the offenders may likewise be subjected to punishment for the same acts as contempts, the two being *diverso intuitu* and capable of standing together. *General Houston's case*, Attorney General Butler, 2 Ops. Attys. Gen. 655; *Rex* v. *Lord Ossulston*, 2 Strange, 1107; *Cross* v. *North Carolina*, 132 U. S. 131; *In re Debs, Petitioner*, 158 U. S. 564; *State* v. *Woodfin*, 5 Iredell, 199; *Yates* v. *Lansing*, 9 Johns. 395; *State* v. *Williams*, 2 Speers, (Law,) 26; *Foster* v. *Commonwealth*, 8 W. & S. 77.

In our opinion the law is not open to constitutional objection, and the record does not exhibit a case in which, on any ground, it can be held that the Supreme Court of the District, sitting as a criminal court, had no jurisdiction to render judgment.

*Writ denied.*

Mr. Justice HARLAN concurred in the result.