**BOWLES, Administrator, O. P. A., v. SEM-INOLE ROCK & SAND CO.**

No. 11032.

Circuit Court of Appeals, Fifth Circuit.

Nov. 14, 1944.

Fleming James, Jr., Dr., Litigation Division, Office of Price Administration, and David London, Chief, Appellate Branch, OPA, both of Washington, D. C., for appellant.

Robert Ruark and S. W. Ruark, both of Raleigh, N. C., and J. M. Hemphill, of Chester, S. C., for appellee.

Before HUTCHESON, HOLMES, and WALLER, Circuit Judges.

HOLMES, Circuit Judge.

This appeal is from a final judgment dismissing an action by the Price Administrator under Section 205 (a) and (e) of the Emergency Price Control Act of 1942, 56 Stat. 23, 50 U.S.C.A. 11, §§ 901 et seq., 925 (a) and 925 (e), hereinafter referred to as the Act. The action was brought to restrain the defendant from continuing to violate the Act and Maximum Price Regulation 188 (7 F. R. 3872) issued thereunder, and to recover from defendant-appellee three times the amount by which the sales prices of certain ballast (crushed stone) sold by the defendant to the Seaboard Air Line Railway were alleged to have exceeded the maximum price permitted by the regulation.

In the fall of 1942 the Seminole Rock & Sand Company sold and delivered 25,239.25 tons of crushed stone to the Seaboard Air Line Railway at 85¢ per ton. Between December, 1942, and May, 1943, the company sold and delivered 92,316.15 tons of the same stone to the same purchaser at $1 per ton. The stone was delivered for use by the purchaser in maintaining the roadbed of the main line of its railroad.

Alleging that the highest price permitted by said Maximum Price Regulation 188 was 60¢ per ton for the material, the Price Administrator brought this suit, which the court below dismissed on the grounds (1) that whatever cause of action existed to recover a money judgment was in the purchaser of the stone, not the Price Administrator, and (2) that the evidence did not show any violation of Price Regulation 188.

Section 205 (e) of the Emergency Price Control Act of 1942, as amended by the Stabilization Extension Act of 1944, provides that if a person selling a commodity violates a regulation prescribing a maximum price, the person who buys the commodity "for use or consumption other than in the course of trade or business" may bring an action against the seller on account of the overcharge; but if the purchaser for any reason is not entitled to bring the action, the Administrator may institute such action in behalf of the United States.

The validity of this regulation is not questioned, and its language is so free from ambiguity that we have no need to explore its origin and purpose to determine its meaning. The effect of its application to the situation found in this case is also clear. The stone was delivered to the railroad for use in maintaining its roadbed, and it was consumed for that purpose. The fact that the purchaser was the ultimate consumer of the material is of no significance, for the statute impliedly excludes not only purchasers for use in the course of trade, but also purchasers for consumption in the course of business.[1] The maintenance of its tracks, roadbeds, and rights-of-way is an essential part of the business of any railroad. These purchases, therefore, were of a commodity consumed in the course of business of the purchaser, and if the price charged exceeded the maximum provided by the regulation, the cause of action arising from such unlawful act was vested by the statute in the Price Administrator only.

Upon the merits the issue turns upon whether the seller's ceiling price for the stone sold was 60¢ per ton, as contended by the Administrator, or $1.50 per ton, as claimed by the seller and as found by the court below.

These are the relevant facts: During the fall months of 1941, the Seaboard Air Line Railway placed with the appellee two orders for 5,000 tons each of crushed stone. These orders promptly were accepted for delivery upon demand at 60¢ per ton.

---

1 Cf. Sen. Rep. 931, 77th Cong., 2nd Sess., page 8; H. Rep. 1658, 77th Cong., 2nd Sess., page 26.

During the month of January, 1942, a Government contractor placed an order with appellee for 7,000 cubic yards of crushed stone (meeting certain specifications) for delivery upon demand at $1.50 a cubic yard, and appellee promptly began its preparations for delivery, crushing the stone in accordance with the specifications and piling it at loading points. The railway company called for delivery of its orders during the month of March, 1942, and delivery was then effected in accordance with the agreements reached during the preceding fall. The government contractor, after accepting delivery of a part of his order in January, 1942, did not request any further deliveries until after March, 1942.

It appears that there is no appreciable difference between a cubic yard of crushed stone and a ton of the same material. There is also ample evidence to support the findings of fact by the trial court that the Government contractor and the railroad were purchasers of the same class, and that the stone delivered to the contractor and that delivered to the railroad were composed substantially of the same material. Indeed, the evidence shows that deliveries to each were filled from the same piles of stone.

On April 28, 1942, the Administrator promulgated a General Maximum Price Regulation by which the prices of all commodities were frozen at the highest price charged therefor in March, 1942. Shortly thereafter, the maximum price chargeable for the specific commodity here sold was fixed by Maximum Price Regulation 188. Section 1499.153 (a) thereof provided that the "maximum price for any article which was delivered or offered for delivery in March, 1942, by the manufacturer, shall be the highest price charged by the manufacturer during March, 1942 (as defined in Section 1499.163), for the article." Section 1499.163 (a) (2) provides that the highest price charged during March, 1942, means (i) the highest price which the seller charged to a purchaser of the same class for delivery of the article or material during March, 1942; or (ii) if the seller made no such delivery during March, 1942, such seller's highest offering price to a purchaser of the same class

for delivery of the article or material during that month.

The appellee contends that its arrangement with the Government contractor bound it to offer the material for delivery each day during March, 1942, at $1.50 per cubic yard, and that this figure, being the highest price it charged during that month, became its maximum price for the material. The Administrator, pointing out that the seller made an actual delivery during March, 1942, under the 60¢ per ton contracts, argues that paragraph (ii), supra, relating to offers for delivery during March, has no application, and that paragraph (i) fixed the maximum price at 60¢ per ton.

We cannot agree with the Administrator that the regulation was intended to be so construed. In order to be binding upon and enforceable by the courts, administrative interpretations either of the law or regulations having the force and effect of law must be in harmony with and tend to effectuate the cardinal purposes of the law, and may not be unreasonable.[2] Moreover, since this court has no jurisdiction to consider the validity or invalidity of these particular regulations, we must accept and apply them in a manner consistent with their validity.[3]

The plain intendment of the statutes and regulations by means of which prices were frozen was to fix those prices indiscriminately at the highest price for which an article of commerce was bought and sold in legitimate trading in the due course of business during March, 1942. The Act requires that the "prices established must be fair and equitable, and in fixing them the Administrator is directed to give due consideration, so far as practicable, to prevailing prices during the designated base period."[4]

Guided by these criteria, what do the interpretative regulations mean when construed in the light of the facts of this case? Here the seller had two enforceable contracts, made at arms-length in the due course of business prior to March, 1942, under which it was required to deliver its product at the demand of the purchasers. The agreed selling price under the one was

[2] Stewart v. Kahn, 11 Wall. 493, 20 L.Ed. 176; In re Chapman, 166 U.S. 661, 17 S.Ct. 677, 41 L.Ed. 1154.

[3] Sec. 204(d) of the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix, § 924(d). Cf. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660.

[4] Yakus v. United States, 321 U.S. 414, 423, 64 S.Ct. 660.

as much a "prevailing price" during the base period as was the selling price of the other. Each purchaser had an equal right to demand, or not to demand, delivery under his contract during the month of March. In these circumstances, does "fairness and equity" in determining the highest price charged require that the highest of these contract prices should control, or should the maximum price chargeable for future business be fixed at the smaller price on the superficial basis that one purchaser chanced to require a delivery in March and the other did not?

We do not think the cited regulations compel a result so unreasonable and so antagonistic to the letter and spirit of the Act as that contended for by the Administrator. Under Section 1499.153 (a) of Regulation 188, either the delivery or offer of delivery of an article during March, 1942, is sufficient to fix a maximum price for that article. Section 1499.163 (a) (2) (i) thereof defines the "highest price charged" to mean the highest price that the seller charged for delivery during March, 1942, not the highest price charged for material that actually was delivered during that month. There is a profound difference, for there was a charge for delivery to the Government contractor of $1.50 per cubic yard throughout the month of March whether or not any material actually was delivered to him at that time.

This interpretation is not precluded by the language of Section 1499.163 (a) (2) (ii). This section does not deal with deliveries or offers of delivery under contracts existing prior to the base period. It does not provide that the seller's highest price charged for goods offered for delivery in March shall fix the alternative maximum price. It rather provides that if the seller made no such delivery, that is, if subsection (i) had no application, then the seller's highest offering price for delivery during that month shall prevail. This section obviously relates to prices quoted by the seller in negotiations for sales for delivery during March, which sales were not consummated; for if such negotiations had ripened into sales for delivery during March, if such offering price for delivery, rather than such offer of delivery, had been accepted, this section, by its own terms, would not have been applicable. Then there would have been a delivery in March requiring the application of subsection (i).

 These two subsections, together with subsection (iii) which manifestly has no application here, were intended to provide a yardstick for determining what was the highest price charged in every situation to which Section 1499.153 (a) applied. If no delivery under either contract had actually been made during March, 1942, the offers of delivery under the contracts still would have been adequate to make this section applicable, yet in such case neither subsections (ii) or (iii) could be applied to determine the highest price charged during that month. For this additional reason, it seems clear that subsection (i), by using the language "charged * * * for delivery," embraces not only charges for deliveries actually made during that month, but also charges for delivery offered under the settled terms of pre-existing contracts.

For these reasons, we hold that subsection (i) is the regulation controlling the maximum price of the material, and that under said regulation the maximum price chargeable by this seller was $1.50 per cubic yard at the time the sales complained of were made. Since the sales price of the shipments did not exceed the maximum price, the seller violated no law or regulation, and the Administrator is not entitled to a money judgment or to injunctive relief.

The judgment dismissing the suit is affirmed.