Karla Vanessa ARCIA, et al., Plaintiffs,

v.

Ken DETZNER, in his official capacity as Florida Secretary of State, Defendant.

Case No. 12–22282–CIV.

United States District Court, S.D. Florida.

Oct. 29, 2012.

Marc A. Goldman, Lorelie Masters, Joshua Friedman, Kristen Rogers, Lindsay Kaplan, and Marina Jenkins, Jenner & Block, Washington, DC, Ben Hovland, Fair Elections Legal Network, Washington, DC, Catherine M. Flanagan, and Michelle Kanter Cohen, Washington, DC, Diana Sen, Jose Perez and Juan Cartagena, LatinoJustice PRLDEF, New York, NY, Katherine Culliton–Gonzalez, Penda Hair, and Uzoma Nkwonta, Advancement Project, Washington, DC, Katherine Roberson–Young, Miami, FL, John De Leon, Chavez & De Leon, P.A., South Miami, FL, Attorneys for all Plaintiffs.

Ashley Davis and Daniel Nordby, Florida Department of State, Tallahassee, FL, Michael Carvin, Josh Gore, and Warren Postman, Jones Day, Washington, DC, Attorneys for Ken Detzner, as the Florida Secretary of State, and the Elections Canvassing Commission.

## ORDER

WILLIAM J. ZLOCH, District Judge.

THIS MATTER is before the Court upon Plaintiffs' Motion For Entry Of Judgment (DE 113) and pursuant to the Parties' Stipulation made in Court at the Status Conference held on October 22, 2012. The Court has carefully reviewed said Motion and Stipulation, the entire court file and is otherwise fully advised in the premises. The Court notes that as to the interpretation of section 8(c)(2)(A) of the National Voter Registration Act, 42 U.S.C. § 1973gg–6(c)(2)(A), this Order supersedes any previous Order entered by the Court. In all other respects, and specifically regarding Plaintiffs' Motion For Preliminary Injunction And Summary Judgment (DE 65) and the issue of the standing of all Plaintiffs, the Court's October 4, 2012, Order (DE 111) remains in full force and effect.

### I. Background

The above-styled cause concerns the implementation of the program known as "Processing Registered Voters—Non–Immigrants" (hereinafter "the Program") by Defendant Florida Secretary of State Ken Detzner (hereinafter "the Secretary"). Plaintiffs were initially comprised of two individuals and five organizations who claim that their rights, and those of their members, "are affected by the program instituted by the Florida Department of State … to carry out a systematic purge of alleged non-citizens from the Florida voter rolls." DE 57, p. 2. The individual Plaintiffs, Karla Vanessa Arcia (hereinafter "Arcia") and Melande Antoine (hereinafter "Antoine"), are United States citizens who are registered to vote in the State of Florida and were included on the Secretary's initial list of potential non-citizens. DE 71, p. 4. The five organizational Plaintiffs included a labor union and various Florida-based civic organizations. These organizational Plaintiffs alleged that their members are at risk of being removed from the voting rolls or, that based on the Program, the organizations themselves have had to divert their resources away from their regular business activities and toward addressing the implementation of the Program. DE 57, pp. 5–8.

On June 19, 2012, Plaintiffs initiated this case with the filing of their Complaint For Declaratory And Injunctive Relief (DE 1), alleging that the Program violated certain provisions of the Voting Rights Act (hereinafter "the VRA") and the National Voter Registration Act (hereinafter "the NVRA"). By this initial Complaint (DE 1), Plaintiffs alleged that in April of 2012, the Secretary began the process of identifying, with the intent of later purging,

potential non-citizens from the rolls of registered voters in the State of Florida. To identify such potential non-citizens, the Secretary obtained information from the Florida Department of Highway Safety and Motor Vehicles (hereinafter "DHSMV") indicating that a registered voter may not in fact be a United States citizen, which was then cross-checked against various other databases. At that time, the Secretary issued a press release which stated that the Department of State was "actively seeking access to federal Department of Homeland Security databases such as SAVE (Systematic Alien Verification for Entitlements) for further verification of immigration status." DE 1, pp. 7–8 (hereinafter "the SAVE database"). The Secretary initially identified 180,000 names of alleged "potential non-citizens" and sent a sample of that list, containing 2, 625 names, to the Supervisors of Elections in Florida's 67 counties. DE 57, p. 1. The Secretary then directed these Supervisors to confirm whether any identified registered voter on the list was indeed a noncitizen, and if so, to begin the statutorily required notice and removal process to remove the individual from the voting rolls.

According to Plaintiffs, the Program— especially in its initial implementation— proved to be inaccurate, and the list of 2,625 "potential non-citizens" included at least some United States citizens, including the two individually named Plaintiffs: Arcia and Antoine. On April 30, 2012, the implementation of the Program was temporarily suspended. Since that time, the Secretary has received access to the federal SAVE database from the Department of Homeland Security (hereinafter "DHS"), which the Secretary alleges "is a rapidly updated federal database that allows state and local governments to check the most recent immigration status of noncitizens who lawfully entered the United States." DE 79, p. 6. By checking an individual's Alien Registration Number (hereinafter "Anumber"), "a unique 9–digit identifier given only to non-citizens," against information in the SAVE database, Defendant maintains that it can accurately ascertain whether a registered voter has been naturalized as a United States citizen. *Id., p.* 7. The Secretary asserts that since its August 14, 2012, declaration to use the SAVE database in the implementation of the Program, "the Secretary's data matching program has identified at least scores of registered voters who have either personally attested to their lack of citizenship or who, after the data matching process, . . . appear to be ineligible registered voters based on non-citizenship." *Id.*

On September 12, 2012, the Parties filed a Stipulation Of Dismissal As To Counts I, II, And Part Of Count IV Of Complaint For Declaratory And Injunctive Relief (DE 56), dismissing the claims under the VRA, and the claim under paragraph (6)(b)(1) of section 8 of the NVRA, that the Program is not uniform, nondiscriminatory, and in compliance with the VRA. Thus, the sole claim that remains by Plaintiffs' First Amended Complaint (DE 57) is that the Program violates the NVRA's prohibition on completing "not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official list of eligible voters." 42 U.S.C. § 1973gg–6(c)(2)(A) (2002). On September 19, 2012, Plaintiffs filed a Motion For Preliminary Injunction And Summary Judgment (DE 65).

The Court held an evidentiary hearing on Plaintiffs' Motion For Preliminary Injunction And Summary Judgment (DE 65) on October 1, 2012. At the hearing, the Court heard from two witnesses on behalf of Plaintiffs: Mr. Dale Ewart, the Assistant Regional Director of the Florida Region for 1199SEIU United Healthcare

Workers East, and Mr. Wilfredo Seda, the Chair of the National Congress for Puerto Rican Rights. The Court then heard argument from Plaintiffs and the Secretary.

By that Motion (DE 65), Plaintiffs asked that the Court do essentially four things: (1) declare that the State's implementation of the Program, specifically in its recent use of the SAVE database, violates the NVRA; (2) enjoin the Secretary from conducting any systematic purge aimed at excluding ineligible voters prior to the November 6, 2012, election; (3) direct the Secretary to ensure that any individual who was removed after August 8, 2012, be restored to the voting rolls prior to October 15, 2012; (4) and instruct the Secretary to file with the Court a list of voters who have been so removed from the voting rolls and/or have been reinstated. DE 65, pp. 1–2.

On October 4, 2012, the Court issued its Order (DE 111) in response to Plaintiffs' Motion For Preliminary Injunction And Summary Judgment (DE 65). First, construing Defendant's Memorandum In Opposition To Plaintiffs' Motion For Preliminary Injunction And Summary Judgment (DE 79) as a Motion to Dismiss for Lack of Standing, the Court found that Plaintiffs failed to establish the organizational standing of Plaintiffs Veye Yo and Florida New Majority, Inc. and therefore dismissed the First Amended Complaint (DE 57) solely as it relates to those two Plaintiffs. *See* DE 111, p. 24. The Court further found that the record evidence regarding Plaintiffs Arcia, Antoine, as well as organizational Plaintiffs the National Congress for Puerto Rican Rights, 1199SEIU United Healthcare Workers East, and Florida Immigrant Coalition, Inc. was sufficient to establish their standing in the above-styled cause. The Court then denied Plaintiffs' Motion (DE 65) to the extent it sought entry of a preliminary injunction in its favor, based on a finding that Plaintiffs

failed to establish a substantial likelihood of success on the merits of their two-Count First Amended Complaint (DE 57). See DE 111. The Court also found that even if Plaintiffs could establish the first factor requisite to the issuance of a preliminary injunction, Plaintiffs would be unable to establish any of the other three preliminary injunction factors. *Id.,* pp. 19–21. The Court also denied Plaintiffs' Motion (DE 65) to the extent it sought entry of summary judgment in Plaintiffs' favor. *Id.,* pp. 21–23. The Court found that there were no issues of material fact in dispute, and for the same reasons underlying the denial of the request for a preliminary injunction, the Court denied entry of summary judgment in Plaintiffs' favor. *Id.*

On October 5, 2012, Plaintiffs filed the instant Motion For Entry Of Judgment (DE 113) requesting that "the Court promptly enter final judgment in favor of Defendant." *Id.,* p. 2. The Court held a hearing on October 22, 2012, at which time both Parties stipulated that they did not object to the Court's entry of final judgment in the above-styled cause, consistent with their September 21, 2012, stipulation that "this action involves a pure question of law under Section 8(c)(2)(A) of the NVRA, 42 U.S.C. § 1973gg–6(c)(2)(A)." *See* DE 71, p. 5. Therefore, because the Court now finds that the Program does not violate section 8(c)(2)(A) of the NVRA, the Court will enter judgment in favor of the Secretary.

## II. *Plaintiffs' Claim Under Section 8 of the NVRA*

■ The Court now considers the sole remaining claim by Plaintiffs' First Amended Complaint—that the Program "violates Section 8(c)(2)(A) of the NVRA, [codified at] 42 U.S.C. § 1973gg–6(c)(2)(A)." DE 57, p. 17.

Subparagraph (c)(2)(A) of section 8 of the NVRA (hereinafter "the 90–day Provision") reads as follows: "A state shall com-

plete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official list of eligible voters." § 1973gg–6(c)(2)(A). Plaintiffs argue that the Program "violates the plain language" of the 90–day Provision and that no part of section 8 excepts the removal of noncitizens by a "systematic program" such as that which the Secretary is implementing here. See DE 65–1, p. 9 & p. 14 n. 9. The Secretary posits several competing interpretations of section 8 of the NVRA. The Secretary first argues that section 8 of the NVRA simply does not concern the removal of individuals who were never properly registered in the first instance[1], or if it does, subsection (b)[2] of section 8 addresses, generally, the removal of those individuals. DE 79, p. 17. He then argues, in the alternative, that subparagraph (a)(3)(B)[3] excepts from the 90–day Provision the removal of registrants "as provided by State law," which would necessarily include the State's statutory proscription against a non-citizen registering to vote. DE 79, p. 20. The Court considers each of these arguments in turn.

### A. The General Removal Provision: Paragraph (a)(3)

In order to understand the meaning of the 90–day Provision, the Court must first look to paragraph (a)(3) (hereinafter "the General Removal Provision"). Paragraph (a)(3) deals with the types of "registrants" who may be removed from "the official list of eligible voters." § 1973gg–6(a)(3). This provision provides:

> (a) In general. In the administration of voter registration for elections for Federal office, each State shall—
>
> · · ·
>
> (3) provide that the name of a registrant may not be removed from the official list of eligible voters except—
>
>> (A) at the request of the registrant;
>>
>> (B) as provided by State law, by reason of criminal conviction or mental incapacity; or
>>
>> (C) as provided under paragraph (4).

*Id.* Paragraph (a)(4) then permits the removal of names of "ineligible voters" by reason of: "(A) the death of the registrant; or (B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d) of this section." § 1973gg–6(a)(4)(A)–(B).

This General Removal Provision found in paragraph (a)(3) is later referenced in paragraph (c)(2), which also contains the 90–day Provision. Paragraph (c)(2) explicitly *exempts* from the 90–day period certain "removals" that are enumerated in

---

**1.** As will be explained, the Secretary argues, and the Court agrees, that paragraphs (a)(3) and (a)(4), which set forth the types of registrants a state may remove from an official list of eligible voters, does not apply to the removal of those individuals who are registered to vote yet were never eligible for such registration in the first instance.

**2.** As will be explained, the Secretary argues, and the Court agrees, that subsection (b), by which a state is to "confirm[][] voter registration," is the only provision of section 8 of the NVRA which applies to the Secretary's Program.

**3.** Subparagraph (a)(3)(B) provides that a state may remove registrants from the list of eligible voters "as provided by State law, by reason of criminal conviction or mental incapacity." The Secretary argues that the State may remove registrants based on State law, inside the 90–day period, based on the fact that subparagraph (c)(2)(B) exempts such a removal from the 90–day period. As explained, the Court does not accept this interpretation of subparagraph (a)(3)(B).

subparagraphs (a)(3)(A), (B), and (a)(4)(A). Subparagraph (c)(2)(B) provides:

(B) Subparagraph (A) shall not be construed to preclude—

(i) the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a) of this section; or

(ii) correction of registration records pursuant to this subchapter.

Thus, the Secretary's Program is not subject to the 90–day Provision if it "remov[es][ ] names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a) of this section" or corrects "registration records pursuant to this subchapter." § 1973gg–6(c)(2)(B)(i)–(ii).

Taking these two provisions together, then, four classifications of "removals" are explicitly excepted from the 90–day Provision, meaning that a removal on these grounds may be effected *at any time.* These grounds, which do not include removal for change of residence, are: (1) removals at the request of the registrant under subparagraph (a)(3)(A); (2) those "provided by State law, by reason of criminal conviction or mental incapacity" under subparagraph (a)(3)(B); (3) removals based on the death of the registrant under subparagraph (a)(4)(A); and (4) "correction of registration records pursuant to this subchapter" under clause (c)(2)(B)(ii). § 1973gg–6(a)(3)(A)-(B), (4)(A); (c)(2)(B)(ii). The Secretary states in a footnote of his Motion For Preliminary Injunction And Summary Judgment (DE 65) that clause (c)(2)(B)(ii), "correction of registration records," may pertain to the Program and allow it to be implemented at any time; yet, because the Parties have not thoroughly explored an interpretation of this clause, and because it was not raised at the October 1, 2012, hearing, the Court will not address it now. *See* DE 79, p. 20 n. 6.

At first blush, it would appear that implementation of the Program would be excepted from the 90–day Provision, because it is "provided by State law" under subparagraph (a)(3)(B). By Florida Statute, individuals who are "not [ ] United States citizen[s]" yet are registered to vote may be removed from "the statewide voter registration system." Fla. Stat. § 98.075(6) (2011). This statute provides the "procedures for removal" that must be followed in order to remove such an individual. Fla. Stat. § 98.075(7) (2011).

Yet, subparagraph (a)(3)(B) cannot reasonably be read to create three independent categories for removals—those based on State law, criminal conviction, and mental incapacity. If this subparagraph were intended to set forth three distinct categories for removal, then indeed any removals "provided by State law" at any time would render the 90–day Provision at best superfluous, and at worst, directly inconsistent with subparagraph (a)(3)(B). This is because removals "provided by State law" based on a change in residence cannot be consistently allowed during the 90–day period under such a reading of subparagraph (a)(3)(B), yet also prohibited during the 90–day period by subparagraph (c)(2)(A). Thus, the Court does not find that the Program's implementation is permitted as "provided by State law" pursuant to such a reading of subparagraph (a)(3)(B).

*B.   The Program Is Not Subject to the General Removal Provision or the 90–day Provision*

As set forth above, paragraphs (a)(3) and (a)(4) provide the exclusive grounds upon which a "registrant" may be removed from the "official list of eligible voters." § 1973gg–6(a)(3)–(4) ("[ T] he name of a registrant may not be removed from the official list of eligible voters except" under four enumerated grounds.). Therefore, if one were to read this provision literally and without reference to any other portion

of section 8 of the NVRA, the *only* grounds by which a state could remove a "registrant," would be: (1) if the registrant requests to be removed under subparagraph (a)(3)(A); (2) the registrant becomes ineligible to vote under state law by reason of criminal conviction or mental incapacity under subparagraph (a)(3)(B); (3) the registrant dies under subparagraph (a)(4)(A)[4]; or (4) the registrant changes his residence under subparagraph (a)(4)(B).

It would necessarily follow, then, that a state would be prohibited from removing from its voting rolls for other valid reasons a registrant who was improperly registered. So a state could therefore not remove from its voting rolls minors, fictitious individuals, individuals who misrepresent their residence in the state, and non-citizens. Not only would this interpretation stand in direct contravention of Florida law, *see* Fla. Stat. § 98.075(6), but it would produce an absurd result. *See In re Chapman*, 166 U.S. 661, 667, 17 S.Ct. 677, 41 L.Ed. 1154 (1897) ("[N]othing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or absurd conclusion."). Therefore, paragraph (a)(3) cannot apply to the removal of non-citizens. *See also United States v. Florida*, 870 F.Supp.2d 1346, 1349–50 (N.D.Fla. 2012) ("This conclusion is inescapable: section 8(a)(3)'s prohibition on removing a registrant except on specific grounds simply does not apply to an improperly registered non-citizen.").

As stated above, subparagraph (c)(2)(B) lists the removals that are excepted from the 90–day Provision[5]: (1) removals at the request of the registrant; (2) those "provided by State law, by reason of criminal conviction or mental incapacity"; (3) removals based on the death of the registrant; and (4) "correction of registration records pursuant to this subchapter." § 1973gg–6(a)(3)(A)–(B), (4)(A); (c)(2)(B)(ii). Therefore, the only removal allowed under paragraphs (a)(3) and (a)(4) that remains subject to the 90–day Provision is a removal based on "a change in the residence of the registrant, in accordance with subsections (b), (c), and (d) of this section." § 1973gg–6(a)(4)(B).

The Court finds no reason to conclude that the 90–day Provision applies to anything other than removals of registrants based on a change in residence. The 90–day Provision is found in subsection (c) of section 8 of the NVRA, which is entitled "Voter removal programs." Paragraph (1) of subsection (c) then details how a state is to implement the requirements of subsection (a)(4) ["a change in residence of the registrant"], such as by "establishing a program" to confirm the change-of-address of a registrant who moves inside or outside the state. Paragraph (c)(2) of course *includes* the 90–day Provision, which, when read in conjunction with paragraphs (a)(3) and (a)(4) reveals that registrants who become ineligible because of a change in residence may not be removed during the 90–day period. Finally, not only does

---

**4.** Subparagraph (a)(3)(C) states that "a registrant may not be removed from the official list of eligible voters except . . . as provided under paragraph (4)," which then provides that "each State shall . . . conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official list of eligible voters by reason of (a) the death of the registrant; or (B) a change in residence of the registrant, in accordance

with subsections (b), (c), and (d) of this section." § 1973gg–6(a)(3)(C), (a)(4)(A)–(B).

**5.** Subparagraph (c)(2)(B) states that subparagraph (c)(2)(A), the 90–day Provision, "shall not be construed to preclude—(i) the removal of names from official lists of voters on a basis described in paragraph (3)(A) or (B) or (4)(A) of subsection (a) of this section; or (ii) correction of registration records pursuant to this subchapter." § 1973gg–6(c)(2)(B)(i)–(ii).

paragraph (c)(2) incorporate by reference paragraphs (a)(3) and (a)(4) in setting forth those removals excepted from the 90–day period, but the language of each of the two provisions tracks the other. Thus, these two provisions are indeed "inextricably linked." DE 105, p. 70. *See also United States v. Florida*, 870 F.Supp.2d at 1350 (" '[R]emoved' in 8(a)(3) and 'remove' in 8(c)(2) mean the same thing. And there is no reason to believe the reference to removing a 'registrant' in 8(a)(3) means something different than removing 'ineligible voters' in 8(c)(2) . . .").

Another way to understand these two sets of provisions is that they only address the removal of once-eligible voters—those who were at one time *bona fide* registrants, yet because of personal request, criminal conviction, mental incapacity, death, or change in residence, became thereafter ineligible. It is indeed notable that these provisions are silent as to the removal of those registered voters who were never *bona fide* registrants, and whose registration was void ab *initio* by virtue of their status as minors, non-citizens, fictitious persons, or any other factor nullifying their registration.

Put simply, these two provisions are meant to be read in conjunction with one another. When read together, the 90–day Provision is meant only to proscribe the removal within 90 days of a federal election of registrants who become ineligible to vote based on a change in residence. Plaintiffs seem to argue that the 90–day Provision's use of the word "systematically" [6] distinguishes some voter removal programs from others. *See* DE 65–1, p. 14 n. 9 ("[T]he Plaintiffs believe non-citizens may be removed from the voting rolls within 90 days of a federal election—as

long as the removal is not part of a systematic program."). To be sure, subsection (c) sets forth mere "voter removal programs," as opposed to *systematic* ones. Yet, this does not change the fact that Plaintiffs cannot direct the Court to any provision of section 8 that differentiates a *systematic* program from a *non-systematic* one; nor can Plaintiffs direct the Court to a provision of section 8 that provides guidance on how to properly remove an individual from the voting rolls who was *never eligible to vote in the first instance.*

At the October 1, 2012, hearing, Plaintiffs explored several measures that they aver should deter non-citizens from registering to vote, or at least from voting, despite their lack of citizenship. Because it is a federal offense for a non-citizen to both register to vote and cast a vote in a federal election, such individuals should be deterred by the consequences of breaking the law. And if those individuals do succeed in casting a vote despite their noncitizenship, they can be criminally prosecuted. See 42 U.S.C. § 1973gg–3(C)(2)(B)(ii); § 1973gg–3(C)(2)(C); 18 U.S.C. § 1015(f). These suggestions give the Court little assurance. Certainly, the NVRA does not require the State to sit idle on the sidelines until a non-citizen violates the law before it can act. And surely the NVRA does not require the State to wait until *after* that critical juncture—when the illicit vote has been cast and its harm fully realized—to address what it views as nothing short of "voter fraud." DE 79, p. 2.

### C. Subsection (b) of Section 8 of the NVRA: Confirmation of Voter Registration

This only leaves one statutory proscription under section 8 that relates to the

---

**6.** The 90–day Provision states that "[a] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to *systematically* remove the names of ineligible voters from the official list of eligible voters." § 1973gg–6(c)(2)(A) (emphasis added).

removal of non-citizens from the voting rolls. Subsection (b), "[c]onfirmation of voter registration," provides that "[a]ny State program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office—(1) shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 ..." § 1973gg–6(b)(1). The only consistent reading of section 8 of the NVRA is that subsection (b) alone applies to programs such as the Secretary's. Further, it is hard to understand why Congress would create a distinct subsection, markedly set apart from subsection (c)'s "[v]oter removal programs," which provides direction regarding the "confirmation of voter registration." By creating two distinct subsections, Congress meant to differentiate the removal of once-eligible voters from those who were never eligible in the first instance.

Finally, subsection (b) is consistent with Congress's finding that "the right of *citizens* of the United States to vote is a fundamental right" and one of the purposes of the NVRA is "to ensure that *accurate* and current voter registration rolls are maintained." § 1973gg(a)(1), (b)(4) (emphasis added). Even the Department of Justice has recently recognized that "federal and state governments have a compelling interest in excluding foreign citizens from activities intimately related to the process of democratic self-government." Brief of the United States *Bluman v. Fed. Election Comm.*, 130 S.Ct. 1087 (2012) (No. 11–275), 2011 WL 5548718, at *11 (internal citations and quotation marks omitted).

It must follow that subsection (b) was meant to apply to programs aimed at removing those voters whose status as registered voters was void *ab initio*. *See also United States v. Florida*, 870 F.Supp.2d at

1350 (holding that pursuant to subsection (b), and in regard to "non-citizens, the state's duty is to maintain an accurate voting list.... But the NVRA does not require a state to allow a non-citizen to vote just because the state did not catch the error more than 90 days in advance.").

Therefore, the Court finds that the Secretary's implementation of the Program is not subject to the 90–day Provision. If the Program is subject to any provision of section 8 of the NVRA, it would be subsection (b); yet, Plaintiffs' First Amended Complaint (DE 57) does not include any claims based on an interpretation of subsection (b). Therefore, both of Plaintiffs' two Counts by their First Amended Complaint (DE 57) fail as a matter of law, and the Court will therefore enter judgment in the Secretary's favor.

### III. Conclusion

■ In reaching its conclusion today, the Court is mindful of the Supreme Court's "guiding principle" that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *Jones v. United States*, 529 U.S. 848, 857, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000). Here, interpreting the 90–day Provision in the manner above avoids reaching the constitutional question of whether Congress has the right so to deprive the states of their authority, pursuant to Article I, Section 2 of the Federal Constitution, to determine the qualifications of eligible voters in Federal elections. On the other hand, interpreting the 90–day Provision in the manner Plaintiffs posit would certainly raise such "grave and doubtful constitutional questions"—however, the Court need not undertake that inquiry today.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' Motion For Entry Of Judgment (DE 113) be and the same is hereby **GRANTED;** and

2. Final Judgment will be entered by separate Order.